UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                     Case No.:  06 CV 13500 (LAK)
------------------------------------------------------------x
SYDNEY NURSE,                                     **DEFENDANTS' STATEMENT OF**
                                                 **MATERIAL FACTS PURSUANT TO**
                          Plaintiffs,            **LOCAL RULE 56.1**

        -against-

CONCEPTS IN STAFFING, INC. and ARTHUR
ABRAMS in his individual and official capacities,

                          Defendants.
------------------------------------------------------------x


        Pursuant to Local Rule 56.1 of the Local Rules of the United States District

Courts for the Southern and Eastern Districts of New York, Defendants Concepts In

Staffing, Inc. and Arthur Abrams (collectively "defendants") set forth the following

statement of material facts as to which they contend there is no genuine issue to be

tried:[1]

### About Concepts in Staffing and Arthur Abrams

1.      Concepts in Staffing ("CIS") is principally engaged in the business of

providing executive search, contract consulting and interim staffing services to

corporations. (Complaint at ¶ 8) (Ex. 29).

2.      CIS was created in 1987 by Arthur Abrams and his wife.  CIS is owned

by Arthur Abrams' wife (Abrams Tr. at 98) (Ex. 31).

3.      Arthur Abrams, who is seventy years old, is the Chief Executive Officer

and President of CIS. (Abrams Tr. at 19, 99).

---

[1]     The following statement of material facts about which there is no genuine issue to be tried is made
solely for purposes of Defendants' Motion for Summary Judgment.  Therefore, Defendants are conceding
for purposes of this motion several facts contended by Plaintiffs.  Should any part of Plaintiffs' complaint
survive this motion, Defendants reserve the right to dispute Plaintiff's version of events, including those
portions contained in this Statement, at trial.

4.     Arthur Abrams has been married for forty eight years and has two children and two grandchildren. (Abrams Tr. at 91).

5.     The complaint filed by Plaintiff is the first time any employee ever filed a complaint of discrimination against CIS. (Abrams Tr. at 333).

### Plaintiff's Ascent From Accounting Coordinator to Controller

6.     Plaintiff is currently employed by CIS  (Complaint. at 14, Plaintiff Tr. at 17.) (Ex. 30)

7.     Approximately nine years ago, in February, 1997, Abrams hired Plaintiff to serve as Accounting Coordinator at CIS. (Plaintiff Tr. at 16).

8.     Plaintiff was promoted to Accounting Manager in 1999, just two years later, by defendant Arthur Abrams. (Complaint at ¶ 14; Plaintiff Tr. at 17, 19).

9.     Plaintiff was promoted to Controller of CIS in 2000 by defendant Arthur Abrams – the position she holds to this day. (Complaint at  ¶ 14; Plaintiff Tr. at 17, 19).

10.     Plaintiff's principle responsibilities are to head of the entire accounting, administrative, IT, contract administration, office cleaning departments of CIS. Plaintiff also oversees and balances the general ledger, and oversees accounts payable, customer service, bank transfers, medical coverage and 401(k), and collections.  Plaintiff supervises the administrative department and sets up interviews for Abrams.  Plaintiff also has the responsibility to distribute office keys and security codes.  (Complaint at ¶ 15; Plaintiff Tr. at 20-23).

11.     Plaintiff is the head of the CIS Human Resources department. (Plaintiff Tr. at 493-94)

2

12.     Plaintiff also manages a staff of approximately eight employees. (Complaint at ¶15; Plaintiff Tr. at 18).

13.     Plaintiff has the authority to hire individuals in her department. (Abrams Tr. at 102; Plaintiff Tr. at 25).

14.     Plaintiff has the authority to fire individuals in her department (Abrams Tr. at 102; Plaintiff Tr. at 25).

15.     Plaintiff has check signing privileges on behalf of CIS. (Abrams Tr. at 106; Lopez Tr. at 17) (Ex. 35).

16.     Plaintiff stated she runs "a big part" of CIS.  (Plaintiff Tr. at 253)

17.     Defendant Arthur Abrams was the individual on behalf of CIS who awarded plaintiff the promotions referred to above. (Abrams Tr. at 108).

### Plaintiff's Generous Compensation Package at CIS

18.     For each of the years from 2000 through 2004, Plaintiff continued to receive substantial raises over the years.  Plaintiff received a total compensation of $79,000.00, which includes a $15,000.00 guaranteed bonus. (CIS0094 Ex. 40)

19.     For the year 2005, Plaintiff received a total compensation of $84,000.00, along with a raise of $5,000.00 to a salary of $60,000.00 and a $15,000.00 guaranteed bonus. (CIS0094 Ex. 40)

20.     For the year 2006, Plaintiff received a total compensation of an annual salary of $94,000.00, including a raise of $14,800.00 to a salary of $74,800.00, a $15,000.00 guaranteed bonus, a $2,800.00 expense reimbursement, and an additional discretionary $7,500.00 bonus approved by Arthur Abrams. (CIS0160 Ex. 40; CIS0094 Ex. 40; CIS0922 Ex. 40; Plaintiff Tr. at 334)

21.    On March 6, 2007, Plaintiff and CIS entered into an agreement where Plaintiff would receive a total compensation for 2007 of $100,900.00, reflecting a $7,500.00 raise in base salary from the prior year, and including a $15,000 guaranteed bonus, $3,600.00 car allowance, a $4,800.00 reimbursement expense, and 3 weeks vacation. (CIS0384 Ex. 40)

22.    Abrams made the decision to give Plaintiff raises. (Abrams Tr. at 108)

23.    Abrams made the decision to award Plaintiff bonuses.  (Abrams Tr. at 108)

24.    As Controller, only Plaintiff was permitted to prematurely draw money from her bonus.  (Plaintiff Tr. at 57)

25.    Of all the dozens of employees at CIS, only Plaintiff and Abrams have parking privileges paid for by CIS.  (Plaintiff Tr. at 54)

## Plaintiff's Relationship With Arthur Abrams

26.    Arthur Abrams is proud of Plaintiff. (Abrams Tr. at 82).

27.    Arthur Abrams believes Plaintiff's work performance has been and remains excellent throughout her employment. (Abrams Tr. at 108).

28.    Abrams gave Plaintiff the use of his time share in Las Vegas.  In thanks, Plaintiff sent Abrams a letter stating "Thank you very, very, much for blessing me with the use of your timeshare," "Thank you, Thank you, Thank you," and signed "Love & Much Respect."  (CIS0029 Ex. 38)

29.    To wish him a happy father's day, Plaintiff sent Abrams a card.  In the personal message, she wrote, "It is truly an honor to work for you…I have been  able

to work for an AMAZING BOSS. I truly appreciate you being a boss and mentor in my life." (CIS0023-24 Ex. 38)

30.     On September 12, 2000, Plaintiff sent Abrams a letter letting him know how thankful she was to him.  She listed as "a few of the things I want to thank you for:" thanking him for giving her control of the CIS finance department, "confiding in me (business & personal)," advancing her bonus early so that she could buy a house, "treating me with respect," "always allowing me to be me," and "so many other things."  Plaintiff stated "You are a <u>Very Special Person</u> and it is important to me that you know." (emphasis in original) (CIS0030 Ex. 38)

31.     In October 2002, Abrams again gave Plaintiff the use of his time share, this time to vacation in Grand Cayman.  Plaintiff sent Abrams a card that stated "word [sic] can not express my feelings of thankfulness and appreciation." (CIS0021-22 Ex. 38)

32.     On April 14, 2003, Plaintiff sent Abrams a card thanking him for his "thoughtfulness" and "kindness."  (CIS0027-28 Ex. 38)

33.     On December 2, 2005, Plaintiff organized an office collection for a holiday gift for Abrams. (CIS0943 Ex. 39)

34.     On December 14, 2005, in furtherance of that effort, Plaintiff sent an e-mail to all CIS staff stating, among other things, "Mr. Abrams is a one of a kind boss." (CIS0085-86; CIS0946 Ex. 39)

35.     For the 2005 holiday season, Plaintiff sent Abrams and his wife a card stating "I could not ask for better bosses or for a better job. I am blessed to know you both." (CIS0025-26 Ex. 38)

5

36.    On an office-wide holiday/birthday card given to Abrams for 2005, Plaintiff wrote "You are a blessing may you live to be 200 years."  (Plaintiff Tr. at 541)

37.    Arthur Abrams is very supportive and protective of  Plaintiff. (Abrams Tr. at 71).

38.    Any inappropriate comments made by Arthur Abrams were stupid and not racially motivated. (Abrams Tr. at 76).

### Plaintiff's Inappropriate Behavior at CIS

39.    Plaintiff often referred to CIS salesperson Joanna King as "Blowanna" and "Blowtesha" in reference to two individuals in the office she believed were having an affair. (Altman Tr. at 121, 147, Ex. 33)(Klein (aka "Howard") Tr. at 108-09, Ex. 34).

40.    Plaintiff also would state on occasion that Joanna King was "doing the dirties" in the office. (Klein Tr. at 112).

41.    Plaintiff contracted or hired a stripper as a birthday surprise for Arthur Abrams. (Klein Tr. at 115).

42.    Plaintiff used the term "white trash" on a least one occasion. (Klein Tr. at 131).

43.    On December 15, 2006, Plaintiff distributed an e-mail to other CIS employees containing a joke about alcohol, sex and chocolate. (CIS1486-89 Ex. 46)

### CIS's Employment Policies

44.    CIS maintains an Employee Handbook, which contains an anti-harassment policy, which prohibits "actions, words, jokes or comments based on an

individual's sex, race, ethnicity, age, religion, disability or any other legally protected characteristic." (CIS0012-13 Ex. 37)

45.     The CIS anti-harassment policy instructs the employee to report any impermissible conduct to their supervisor, or if such report is impracticable, to report to the "next higher manager or Controller." (CIS0012)

46.     The CIS anti-harassment policy states that "Employees can raise concerns or make reports without fear of reprisals." (CIS0012)

47.     The CIS anti-harassment policy provides that possible unlawful conduct will be handled in a "timely and confidential manner," and any harasser will be subject to discipline including termination. (CIS0012)

48.     Per the CIS Harassment Policy, Plaintiff, as the Controller, is primarily responsible for handling all complaints of workplace harassment. (CIS0012)

49.     At all relevant times, Plaintiff was familiar with the CIS anti-harassment policy. (Plaintiff Tr. at 37)

50.     The CIS Employee Handbook contains an employee awareness policy that instructs an employee who has witnessed workplace wrongdoing, which includes sexual harassment and discrimination, to report the conduct to their manager. (CIS0010 Ex. 37)

51.     The CIS Employee Handbook contains an "Hours of Work" policy, which states, "A set minimum or maximum hours of work each week are not guaranteed. Overtime may be required." (CIS0014 Ex. 37)

## Alleged Inappropriate Racial Comments

<u>Abrams</u>

52.    Plaintiff alleges Abrams referred to the accounting staff as "minorities." (Plaintiff Tr. at 302)

53.    In March, April or May of 2005, Abrams allegedly told Plaintiff he did not want any blacks or Hispanics on the CIS company website.  (Plaintiff Tr. at 64, 67, 79)

54.    Plaintiff claims Abrams told her and other employees that the rough draft of the website was an "abortion," which Plaintiff found to be degrading to women.  Plaintiff cannot recall when the comment was made. (Plaintiff Tr. at 97-98)

55.    Plaintiff admits Abrams knew the website was being developed by men and women, and made the abortion comment in the presence of both men and women.  (Plaintiff Tr. at 98-99)

56.    In approximately June or July 2005, Abrams allegedly told Plaintiff, "I still do not want any blacks and Hispanics on my website."  (Plaintiff Tr. at 306)

57.    On June 30, 2006, Plaintiff claims Abrams told Flaviana Lopez he wanted to sit a new Hispanic employee "in the back of the bus" and made reference to the "black and Hispanic section" of the office.   Plaintiff did not witness this comment and learned about it from Lopez.  (Plaintiff Tr. at 211-13, 432).  Lopez testified that Abrams did no refer to race when this comment was made (Lopez Tr. at 46-49).

8

58.   Plaintiff alleges Abrams called her "black girl" approximately fifty to sixty times, including in front of African-American job applicants fifteen to twenty times, starting in approximately 2001.  (Plaintiff Tr. at 103-5, 110-11).

59.   Plaintiff believes Abrams made the "black girl' comment in front of Lisamarie Cruz, Doris Perez and Stu Burton.  (Plaintiff Tr. at 106)

60.   Plaintiff told Abrams if he was not going to call white employees white girl, he did not need to call her "black girl."  (Plaintiff Tr. at 107)

61.   Abrams told Burton he was "the dumbest white person in the world." (Burton Tr. at 206, Ex. 32)

62.   Abrams referred to Plaintiff as "black" in front of African-American job applicants because he was proud of her achievements and wanted to impress upon the applicant that he was "color blind." (Abrams Tr. at 274)

63.   Plaintiff admits Abrams made the "black girl" comments to her because he "could have been proud of me."  (Plaintiff Tr. at 109-10)

64.   Once between October and December 2006, Plaintiff claims Abrams told her he would continue to call her "black girl" after the lawsuit was commenced. (Plaintiff Tr. at 106-7, 111)

65.   Plaintiff claims she complained about the "black girl" comments to Stu Burton and specifically used the word "racist."  (Plaintiff Tr. at 111-12)

66.   Plaintiff heard Abrams refer to Doris Perez as "Dominican girl" many times starting in 2003, but not after the EEOC charge was filed.  (Plaintiff Tr. at 116-18)

67.    Plaintiff can only specifically recall Perez being introduced as "Dominican girl" one time in 2005 or 2004. (Plaintiff Tr. at 132-33)

68.    In approximately June 2006, Plaintiff claims Abrams told her to fire Doris Perez when she was out on maternity leave because she wouldn't be able to manage her children and job. (Plaintiff Tr. at 138-40)

69.    In September or October of 2006, Abrams allegedly told Plaintiff he had to fire Doris Perez because she lived in New Jersey and he was concerned she wouldn't be able to do her job because of the distance. (Plaintiff Tr. at 141-42)

70.    Abrams also allegedly told Perez he wanted to fire her because he thought she stole CIS company funds by first taking maternity leave and then cashing a vacation paycheck. (Plaintiff Tr. at 143)

71.    Doris Perez was not fired. (Plaintiff Tr. at 140-41, 144)

72.    Plaintiff claims Abrams refused to add a bonus clause to Alfred Leonard,s a African American American, contract. Plaintiff claims this bonus clause was present in the contracts of Leonard's peers at CIS, who were white. (Plaintiff Tr. at 489-90)

73.    Plaintiff admits Abrams agreed to modify Leonard's contract by adding a travel reimbursement in place of the bonus clause. (Plaintiff Tr. at 490)

74.    When giving Doris Lopez the contract proposal to write up, Abrams never mentioned Leonard's race or told her why Leonard was not getting the bonus clause. (Lopez Tr. at 23)

75.    Plaintiff claims Abrams use the term "wetbacks" once in 2005. (Plaintiff Tr. at 119-20)

10

76.     Plaintiff claims Abrams referred to an Asian employee as a "Chinese motherfucker." This comment was not witnessed by anyone except Plaintiff. (Plaintiff Tr. at 124-25)

77.     Plaintiff has heard Abrams make rude comments to non-minorities before.  (Plaintiff Tr. at 113)

78.     Sometime in 2005, Abrams allegedly told Plaintiff he did not want to meet with Prudence Shilang, a female, African employee, to renegotiate her contract.  (Plaintiff Tr. at 313)

79.     Plaintiff claims Abrams told Shilang that she wanted to renegotiate her contract to get more money, because "it's difficult coming from poverty."  (Plaintiff Tr. at 315, 467)

80.     Plaintiff believes Abrams "would never say [the poverty comment] to a white person."  (Plaintiff Tr. at 316)

81.     Plaintiff was not present during every contract negotiation between Abrams and other employees.  (Plaintiff Tr. at 316)

82.     Plaintiff admitted Abrams negotiated contracts with non-minorities. (Plaintiff Tr. at 316)

83.     The only criteria Arthur Abrams considers when hiring is whether the individual can make money (Altman Tr. 1t 145).

84.     Arthur Abrams does not consider race when hiring salespeople or other staff. (Altman Tr. at 146).

Les Howard

11

85.    Plaintiff alleges Howard "randomly" called her a "black bitch" approximately thirty times from 2002 to 2006.  (Plaintiff Tr. at 260-61)

86.    Plaintiff allegedly complained to Abrams and Stu Burton about Howard calling her a "black bitch." (Plaintiff Tr. at 264)

87.    Plaintiff's only complaint to Abrams about Howard calling her a "black bitch" occurred after an alleged incident on July 5, 2006. (Abrams Tr. at 71-72)

88.    No one else at CIS ever told Abrams that Les Howard called Plaintiff a "black bitch."  (Abrams Tr. at 72).  Les Howard testified that he and Plaintiff would exchange e-mails when they worked late.  Les Howard would say "Syd go home. And she would say "Lesito", just as a pet name (Howard Tr. at 138).

<u>Brad Adams</u>

89.    Plaintiff claims Brad Adams told Lisamarie Cruz that "minorities are supposed to suffer."  Plaintiff admits she did not witness the comment.  (Plaintiff Tr. at 421-22)

90.    In November or December 2006, Plaintiff alleges Terra Davis complained to Abrams about Brad Adams making racial comments and Abrams refused to take action.  (Plaintiff Tr. at 423, 462-63)

**<u>Alleged Inappropriate Sexual Touching/Acts</u>**

<u>Abrams</u>

91.    Plaintiff claims Abrams touched her breast one time in 2006, prior to filing her EEOC charge. (Plaintiff Tr. at 146-151).

12

92.     Although it allegedly occurred before she filed the charge, Plaintiff did not allege in her EEOC charge that Abrams had touched her breast. (Plaintiff Tr. at 151)

93.     Plaintiff alleges Abrams, in an attempt to hug her, grabbed her around the neck in front of James, a doorman in the building, and Willie, who was talking to James at the time. Plaintiff claims Abrams said "she works for me, I can do what I want to her" during the encounter. (Plaintiff Tr. at 153-54, 159)

94.     Plaintiff alleges Abrams grabbed her and kissed her on the face approximately ten times over the past four to five years. (Plaintiff Tr. at 154, 159)

95.     Plaintiff alleges Abrams massaged her neck. (Plaintiff Tr. at 154)

96.     Plaintiff claims that Abrams stroked her arm approximately forty times within the past seven years. Plaintiff told Abrams to stop approximately fifteen to twenty of those times. (Plaintiff Tr. at 159)

97.     In 2000 or 2001, Plaintiff alleges Abrams physically pinned her up against a radiator or heater in his office and told her "you can't get away from me." (Plaintiff Tr. at 156-57, 161)

98.     Plaintiff claims that Abrams invited her to a bar on approximately 10 to 14 occasions in 2000 or 2001, and would pretend that they were dating. Plaintiff claims Abrams touched her hand or rubbed her arm at the bar. (Plaintiff Tr. at 192-93, 196)

99.     Plaintiff alleges Abrams touched and played with Lisamarie Cruz's hair approximately ten times between 2004 and 2006. (Plaintiff Tr. at 155, 317, 320-21)

13

100.    Plaintiff claims Cruz hit Abram's hand when he touched her hair. (Plaintiff Tr. at 321)

101.    Plaintiff claims Cruz told her "what's up with this old guy" in reference to Abrams touching her hair.  (Plaintiff Tr. at 321)

102.    Plaintiff alleges Abrams touched and played with Jahaira Hernandez's hair probably more than ten times during an unspecified period of years.  (Plaintiff Tr. at 317)

103.    Plaintiff alleges Abrams grabbed Hernandez and kissed her on the cheek.  (Plaintiff Tr. at 322)   Arthur Abrams kissed Stuart Burton on the cheek (Abrams Tr. at 344-45).

104.    Plaintiff alleges Hernandez did not kiss Abrams back and said, "don't touch me." (Plaintiff Tr. at 322)

105.    Plaintiff alleges Abrams touched Susan Ackerly's hair two or three times in 2002 or 2003.  (Plaintiff Tr. at 155, 445-46)

106.    Plaintiff alleges Abrams played with Julia Mackie's hair five to ten times between 1999 and 2001.   Plaintiff claims Mackie complained about the conduct to her.  (Plaintiff Tr. at 442-43)

107.    Plaintiff alleges Norm Wasserman, a CIS vice-president, complained to her about Abrams touching the women, including Ackerly and Maureen Rooney, in his department in 2002 or 2003.  When Plaintiff approached Abrams about the complaint, she claims he told her to fire Ackerly immediately.  (Plaintiff Tr. at 446-48)

108.    Ackerly was not fired.  (Plaintiff Tr. at 449)

109.   Plaintiff alleges she saw Abrams touch Andrew (last name unknown), a male African-American employee, on the chest, grab his shoulder and grab him around the neck.  (Plaintiff Tr. at 318)

110.   Plaintiff alleges she saw Abrams touch Steven Edelman, a Caucasian, in the same way as Andrew.  (Plaintiff Tr. at 318)

111.   Plaintiff alleges she saw Abrams touch Liesel Harper on the waist, stroke her arms, and hold her hand while standing behind her at her desk.  (Plaintiff Tr. at 319)

112.   Plaintiff alleges Abrams touched Doris Perez's breasts on one occasion in 2006.  Plaintiff did not witness the encounter and learned of it from Perez.  Plaintiff did not speak to Abrams about the incident.  (Plaintiff Tr. at 358-59)

113.   Lopez stated Abrams touched Perez's chest, but not her breasts, once in May or June 2006.  (Lopez Tr. at 136-37)

114.   Plaintiff alleges Abrams turned off the lights in his office and attempted to put his arm around and kiss Lopez on her face, not lips.  Abrams then allegedly asked Lopez to watch him exercise.  Plaintiff admits she could not see into the office during the encounter because the door was closed, and learned all of the details of the encounter from Lopez.  (Plaintiff Tr. at 435-41)

115.   Lopez testified Abrams merely asked her to watch him do his exercises, and that the lights were already off in his office. She further testified Abrams was always "a few feet away" during the entire encounter.  (Lopez Tr. at 127-31).

116.   In January of 2006, Plaintiff did not believe her working environment was "severe enough for me myself to have ever thought about filing a claim for Concepts in Staffing." (Plaintiff Tr. at 274)

117.   Plaintiff describes the work environment at CIS as "rough" because of the sales pressure inherent in the nature of the business. Plaintiff said the CIS work environment "is not really the type of environment where the employees really want to interact well or work well together." (Plaintiff Tr. at 50)

118.   In 2004, Plaintiff hired Liesel Harper, a young black female, who is her cousin, to work at CIS. Harper continued to work at CIS until 2006. (Plaintiff Tr. at 87, 319, 321)

119.   "At one point," Harper became Abrams's personal assistant and had daily interaction with Abrams. Plaintiff agreed that Harper would be a "good fit" for Abrams. (Plaintiff Tr. at 391, 393)

120.   Plaintiff terminated Harper as a result of an argument between Plaintiff and Harper over Plaintiff's refusal to give Harper's paycheck to her boyfriend, who Plaintiff believed was abusive. (Plaintiff Tr. 399-402)

Les Howard (aka "Lester Klein")

121.   Lester Klein, a former salesperson at CIS, met Arthur Abrams in 1979.[2] (Howard Tr. at 35).

---

[2]   Mr. Klein's full name is Lester Howard Klein. He went by the name "Lester Howard" at CIS as a marketing strategy to avoid potential confusion on the spelling of his last name from prospective clients. (Klein Tr. at 249-50)   Accordingly, Mr. Klein is referred to in the record by the names Lester Klein and Lester Howard.

122.   Lester Klein was associated with Mr. Abrams from 1979 until 2006. (Howard Tr. at 36).

123.   On July 5, 2006, Plaintiff complained to Abrams that Les Howard rubbed a check request on his pelvic area, pumped his pelvic area in Plaintiff's face. (Abrams Tr. at 131-32; Plaintiff Tr. at 227-31)

124.   Plaintiff thought the original check request was possibly soiled with blood, so Howard made a clean copy to give to Plaintiff.  (Plaintiff Tr. at 230)

125.   Howard wiped the check request on his pants to show Plaintiff that it was not soiled.  (Howard Tr. at 134-35)

126.   Howard did not intend to insult Plaintiff. He thought they were friends. (Howard Tr. at 138-39)

127.   Howard sent Plaintiff an apology via e-mail because he considered Plaintiff a longtime friend and felt bad.  (Howard Tr. at 143; CIS 0156)

128.   Abrams did not think there was anything funny about Plaintiff's July 5, 2006 complaint regarding Les Howard.  (Abrams Tr. at 145)

129.   When Plaintiff told him about Les Howard's conduct on July 5, 2006, Abrams laughed to show his complete disdain for Howard's conduct. (Abrams Tr. at 142-43)

130.   Plaintiff did not ask Abrams to immediately terminate Les Howard on July 5, 2006.  (Abrams Tr. at 150)

131.   Abrams promised Plaintiff during a telephone call on July 5, 2006 that he would fully investigate Les Howard's alleged inappropriate conduct and take appropriate action.  (Abrams Tr. at 148-50)

132.   As part of his investigation, Abrams met with the administrative staff on July 12, 2006.  Abrams asked whether any had witnessed Les Howard's conduct on July 5, stated that the conduct was wrong and that he would attempt to address the situation.  (Plaintiff Tr. at 300)

133.   As a result of his investigation, and although Howard denied all of Plaintiff's allegations, Abrams terminated Les Howard's employment approximately one week after Plaintiff's initial complaint.  (Abrams Tr. at 122-23, 156, 169; Plaintiff Tr. at 260, 295; Lopez Tr. at 94, 108)

134.   Abrams did not personally witness any of Les Howard's alleged conduct, but decided to terminate him out of loyalty to Plaintiff, who is his most trusted employee. (Abrams Tr. at 159, 169, 170)

135.   Les Howard had worked for Abrams for over twenty-six years and was one of CIS's top producers.  (Abrams Tr. at 119-120)

Jeff Turner

136.   Sometime in the year 2000, Jeff Turner, a CIS employee, allegedly smacked Olga Ramos, a female employee, on the buttocks.  Plaintiff did not witness this conduct.  (Plaintiff Tr. at 292-93)

137.   Olga Ramos reported the encounter with Turner to Plaintiff, who met with Turner regarding the incident.  (Plaintiff Tr. at 453-54)

18

138.    To resolve the issue with Turner, Plaintiff moved Ramos's desk to another floor.  Subsequent to this action, Ramos never had another problem with Turner.  (Plaintiff Tr. at 457-58)

Michael Neil

139.    Plaintiff alleges Michael Neil made comments to Samanta Moore, another employee, about his penis in January 2007.  Plaintiff did not witness these comments.  (Plaintiff Tr. at 472, 475, 477)

140.    Plaintiff alleges Michael Neil grabbed Samantha Moore and made "humping" motions against her.  Plaintiff did not witness this conduct – it was reported to her by Alfred Leonard, another employee.  (Plaintiff Tr. at 471-72, 476-77)

141.    Plaintiff claims she disciplined Neil in a meeting on January 24, 2007, where she told him to stop his inappropriate conduct towards Moore.  The meeting was memorialized with a memo dated the same day.  (Plaintiff Tr. at 477-78, 481-82)

142.    Neil was terminated by Stu Burton the following day, on January 25, 2007.  (Plaintiff Tr. at 481-82)

Steve Augen

143.    On an unspecified date in 2000, former CIS employee Steven Augen touched Plaintiff's breasts.  (Plaintiff Tr. at 167)

Erez Shilo

144.   On an unspecified date in early 2000 or 2001, former CIS employee Erez Shilo allegedly unzipped his pants zipper (but did not reveal his penis) and told Plaintiff, "kiss this."  (Plaintiff Tr. at 177, 181)

## Alleged Inappropriate Sexual Comments

Les Howard

145.   Plaintiff alleges Les Howard told her "your top looks nice", "the shirt looks good too", and motioned with his hands to show the size of her breasts approximately twenty times between 2002 and 2006.  (Plaintiff Tr. at 267)

146.   Plaintiff alleges Howard made similar comments about Doris Perez's shirt and breasts. (Plaintiff Tr. at 267-68)

147.   Plaintiff believes Howard's comments about her shirt and hand gestures were observed by the entire accounting office. (Plaintiff Tr. at 268-69)

148.   Plaintiff complained to Abrams about the comments Howard made about shirts and breasts. (Plaintiff Tr. at 268)

149.   Plaintiff admits Les Howard would not get paid unless Plaintiff processed his pay.  (Plaintiff Tr. at 271)

150.   Plaintiff complained about Howard, Abrams would call him into his office and call him a "moron," telling Howard that his inappropriate behavior could not continue.  (Abrams Tr. at 138)

151.   Plaintiff admits Abrams told Howard to leave her alone and stay out of her office. (Plaintiff Tr. at 266)

152.   Plaintiff never asked Abrams to fire Les Howard prior to the July 5, 2006 check request incident.  (Plaintiff Tr. at 369-70).  Les Howard was terminated. (Abrams Tr. 190).

### Alleged Retaliatory Conduct

153.   152. On January 16, 2006, Plaintiff obtained an Employment Practices Liability insurance policy for CIS from Chubb Insurance Group. (Plaintiff Tr. at 44-46; CIS0208 Ex. 44)

154.   On July 6, 2006, Plaintiff reported the July 5, 2006 incident between her and Lester Howard to Shiela Hickman of Chubb Insurance. (CIS0249 Ex. 44)

155.   Plaintiff reported directly to CIS's insurer because she wanted the insurance company to be on notice of the inappropriate workplace conduct at CIS and to speak to Abrams to stop the conduct.  (Plaintiff Tr. at 273)

156.   Plaintiff expected that the insurance company would attempt to resolve the claim by paying her money.  (Plaintiff Tr. at 298)

157.   Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on August 22, 2006.  The Charge does not contain any additional allegations than those set forth in Plaintiff's Complaint (CIS 0170 – 0176, CIS 0251 – 0256, Ex. 43).

158.   Plaintiff filed her Complaint in this action in or about November 28, 2006.

159.   Plaintiff filed an amended Charge with the EEOC in or about March 22, 2007.  (CIS 0171 – 0176).

160.   Plaintiff filed her Amended Complaint in or about May 15, 2007. (Ex. 29).

161.   Plaintiff alleges that on July 7, 2006, Abrams threatened to fire her unless she signed a statement dropping all the charges she made in the claim to the insurance company about Les Howard.  (Plaintiff Tr. at 286-87, 499, 501-03)

162.   Plaintiff admits Abrams told her he would not fire her or force her to drop her claims after speaking to the insurance company.  (Plaintiff Tr. at 288-89, 291)

163.   Plaintiff alleges Abrams continued to ask her to drop the charges and tell her he was "disappointed" in her after she filed her claim.  Plaintiff also alleges Abrams told her to "bring it on." (Plaintiff Tr. at 323, 520, 522)

164.   On August 2, 2006, Abrams distributed a memo to CIS administrative employees stating that all overtime must be approved by Abrams. (CIS0118-24 Ex. 41)

165.   Plaintiff "guessed" Abrams instituted the overtime prohibition to "piss me off" and "to work me harder."  (Plaintiff Tr. at 323-24)

166.   Abrams issued the overtime policy because of a need to "hold down expenses." (Abrams Tr. at 530-32)

167.   After the overtime policy was issued, Plaintiff's work hours dropped from sixty-five to seventy hours per wee to fifty hours per week.  (Plaintiff Tr. at 514-15)

168.   Lopez claims the overtime prohibition was discussed, but never actually implemented at CIS.   The admin staff held a meeting with Abrams

approximately two days after the overtime policy was issued and asked him to rescind the policy because it was not fair to the hourly workers. Abrams allegedly said "I hear you, I hear you," and tore up all of the overtime policy memos the staff had signed. Lopez began working overtime again, and was paid overtime wages. (Lopez Tr. at 169, 177-83, 189-90)

169.   Plaintiff alleges Abrams retaliated against her because he told the administrative staff not to call Plaintiff if they wanted time off.  Plaintiff believes Abrams did this to demonstrate his control over the company as owner.  (Plaintiff Tr. at 511, 518)

170.   The office staff continued to call Plaintiff to ask for time off, despite Abrams's alleged directive.  (Plaintiff Tr. at 519)

171.   Plaintiff alleges she was retaliated against because Mark Levitt, CIS's accountant, stopped speaking to her, and it was critical from them to speak to each other in order for her to perform her job.  (Plaintiff Tr. at 325, 510)

172.   Plaintiff admitted she did not know if Abrams instructed Levitt not to speak to her.  (Plaintiff Tr. at 325)

173.   Plaintiff admitted Levitt began speaking to her again after she had a meeting with Levitt and Abrams in September or October 2006, where she asked Levitt to continue to work with her.  (Plaintiff Tr. at 326-27)

174.   Plaintiff admitted Abrams specifically instructed Levitt to work with her during a  meeting.  (Plaintiff Tr. at 328)

175.    Plaintiff "believes" Abrams told her that he never instructed Levitt not to speak to her, but Levitt had to defend him because he is Abrams's brother-in-law. (Plaintiff Tr. at 328)

176.    Plaintiff alleges Abrams retaliated against her by telling Doris Perez and Shante Speller, in April 2007 and May 2007, respectively, that "they needed to be on his side because he signs their checks." (Plaintiff Tr. at 328-29)

177.    In July or August 2006, Plaintiff alleges Abrams told Doris Perez that Plaintiff "wouldn't be with the firm much longer" and would be "replaced with Mark Levitt." Plaintiff further alleges Abrams asked Perez if she would be comfortable assuming some of Plaintiff's responsibilities. Plaintiff admits she did not witness this conversation. (Plaintiff Tr. at 329-30)

178.    Perez stated Abrams never said he was going to fire Plaintiff, but instead Abrams told her he thought that Plaintiff would leave CIS after the lawsuit was over. (Perez Tr. at 74-75, Ex. 36)

179.    Plaintiff admits she was not present for the conversation between Abrams and Shante Speller in April or May 2007. (Plaintiff Tr. at 332)

180.    During the September or October 2006 meeting with Levitt and Abrams, Plaintiff alleges Abrams said he would fire anyone in the accounting department who did not attend the company holiday party, including Plaintiff. Plaintiff claims Abrams then called in Doris Perez, Syreea Houston, Samantha Moore, and possibly Flaviana Lopez individually, asked each whether they would attend the party, and threatened to fire them if they did not. (Plaintiff Tr. at 332)

181.   Plaintiff admits she was not present for the conversations between Abrams and Perez, Houston, Moore and Lopez regarding the holiday party. (Plaintiff Tr. at 332)

182.   Plaintiff alleges Abrams told her during the September or October 2006 meeting that anyone who did not come to the holiday party would not receive a bonus and would be terminated. (Plaintiff Tr. at 331-32)

183.   Plaintiff alleges Abrams retaliated against her because he did not ask her to plan the CIS 2006 holiday party. (Plaintiff Tr. at 527)

184.   Plaintiff admitted she was "happy" that Abrams did not want her to plan the CIS 2006 holiday party because it was "easier" for her. (Plaintiff Tr. at 527)

185.   Plaintiff alleges Abrams retaliated against her by refusing to speak to her and by asking Doris Perez to give Plaintiff instructions.   Plaintiff believes Abrams's refusal to speak to her affects her job because it makes her feel "uncomfortable" and "constantly nervous" about being fired. (Plaintiff Tr. at 333)

186.   Plaintiff admits she is still able to perform her job as the CIS Controller in the current work environment. (Plaintiff Tr. at 333-34)

187.   Lopez has not noticed any change in Plaintiff's job performance since the lawsuit. (Plaintiff Tr. at 34)

188.   Plaintiff alleges Abrams told Steven Edelman and Amy Burwell that he was going to let Plaintiff go. (Plaintiff Tr. at 336)

189.   Plaintiff alleges Abrams told Shante Speller that once Plaintiff was let go, he would replace her with someone else and Mark Levitt, and would assign some of Plaintiff's duties to Doris Perez and Speller. (Plaintiff Tr. at 337)

190.    Plaintiff admits she did not witness Abrams's conversations with Edelma Burwell, or Speller regarding letting Plaintiff go.  (Plaintiff Tr. at 337)

191.    Plaintiff alleges on almost a daily basis over a period of five months, Abrams would speak to her about the lawsuit, telling her he wasn't afraid of her attorneys and that she couldn't find another job in the city that would pay the same as CIS.  (Plaintiff Tr. at 338)

192.    Plaintiff alleges Abrams called her into his office and yelled at her, saying "you're trying to extort money from me."  (Plaintiff Tr. at 523)

193.    In July 2006, Plaintiff alleges Abrams threatened to fire Shante Speller in order to get back at her for filing her complaint.  (Plaintiff Tr. at 503, 505, 507)

194.    Plaintiff admits Speller is still employed at CIS.  (Plaintiff Tr. at 506)

195.    Abrams told Plaintiff he was going to fire Speller because of "cutbacks."  (Plaintiff Tr. at 506)


Dated:      New York, New York
            August 21, 2007


                                    Mercedes Colwin (MC 3862)