**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
SYDNEY NURSE,                                        :
                                                    :
                            Plaintiff,              :
                                                    :                 06-CV-13500 (LAK)
            v.                                      :
                                                    :
CONCEPTS IN STAFFING, INC. and ARTHUR               :
ABRAMS in his individual and official capacities,   :
                                                    :
                                                    :
                            Defendants.             :
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS PURSUANT TO**
**FEDERAL RULES OF CIVIL PROCEDURE 50(b), 59(a) and 59(e)**

Kenneth P. Thompson (KT-6026)
Scott Browning Gilly (SG-6861)
Kathryn J. Webber (KW-9576)

THOMPSON WIGDOR & GILLY LLP
350 Fifth Avenue
Suite 5720
New York, NY 10118-0110
(212) 239-9292

Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................. iii

PRELIMINARY STATEMENT ......................................................................1

ARGUMENT................................................................................................2

I. DEFENDANTS' MOTION FOR JUDGMENT MUST BE DENIED IN LIGHT OF THE OVERWHELMING EVIDENCE OF HOSTILE WORK ENVIRONMENT ...........2

A. Plaintiff Presented Substantial Evidence of Racial Discrimination and Harassment................................................................................................2

B. Plaintiff Presented Substantial Evidence of Sexual Harassment at Trial...........5

II. THE WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S VERDICT AND DOES NOT MERIT A NEW TRIAL UNDER RULE 59 .................................................7

A. Defendants' Motion for a New Trial Should be Denied as a Matter of Law ..........................................................................................................7

B. The Court Properly Admitted Evidence Concerning Prior Harassing Acts ...........................................................................................................9

1. The Erez Shilo Incident was Part of a Pattern of Harassment and Failure by Defendants to Address That Harassment..........................10

2. The Jeff Turner Incident was Carefully Limited by the Court and Demonstrated the On-going Failure by Defendant Abrams to Address Harassment.................................................................................11

3. The Susan Ackerly Incident was Part of a Pattern of Harassment ........12

4. Incidents Concerning Defendant Abrams Were Properly Admitted .................................................................................................12

C. Counsel's Comments During Summation Do Not Warrant a New Trial..........13

1. Defendants' Failure to Object Requires a Showing of Plain Error........13

2. Counsel's Comments Regarding Three Card Monty/Slight of Hands, Irrelevance of Testimony and Mona Abrams Do Not Rise to the Level of Plain Error.......................................................................................14

3. Comments Regarding Counsel's Insurance Policy Questioning

Did Not Cause Undue Prejudice ..................................................................17

4. The Jury's Award Negates any Claim of Error or Prejudice ................18

5. The Evidence in Support of the Verdict Demonstrates No Error
or Prejudice ...............................................................................................19

6. Defendants' Cases Are Distinguishable.................................................20

III. THE JURY'S AWARD FOR COMPENSATORY AND PUNITIVE DAMAGES
DOES NOT SHOCK THE CONSCIENCE AND SHOULD BE UPHELD....................21

A. Pursuant to the New York City Human Rights Law, a "Shocks the Judicial
Conscience Plus" Standard Applies.........................................................21

B. The $700,000 Compensatory Award is Sustainable Under this Standard ........24

1. Plaintiff's Claim for Emotional Distress is Not Garden Variety ...........24

2. Plaintiff Presented Substantial Evidence of Her Severe Emotional
Distress......................................................................................................24

3. The Jury's Award of $700,000 in Compensatory Damages Does
not Shock the Conscience and Should be Confirmed...............................27

C. The Jury's Award of Punitive Damages is Supported by The Evidence
and is in Line with Awards in Similar Cases...........................................29

1. Reprehensibility ....................................................................................30

2. Proportionality of Damages ..................................................................32

3. Comparable Cases.................................................................................32

IV. A NEW TRIAL ON DAMAGES SHOULD NOT ALSO REVISIT LIABILITY .....34

CONCLUSION...........................................................................................................36

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alholm v. America Steamship Co.*,
    144 F.3d 1172 (8th Cir. 1998) ..........................................................................................16

*Annis v. County of Westchester*,
    136 F.3d 239 (2d Cir. 1998)..............................................................................26, 27, 35

*Augustin v. Yale Club of New York City*,
    No. 03-CV-1924 (KMK), 2006 WL 2690289 (S.D.N.Y. Sept. 15, 2006) .........................4

*Beyar v. City of New York*,
    No. 04 cv 3765 (JFB) (KAM), 2007 U.S. Dist. LEXIS 47447
    (E.D.N.Y. June 29, 2007) ...................................................................................................16

*Binder v. Long Island Lighting Co.*,
    847 F. Supp. 1007 (E.D.N.Y. 1994), *aff'd in relevant part*, 57 F.3d 198
    (2d Cir. 1995)............................................................................................................26, 27

*Brady v. Wal-Mart Stores, Inc.*,
    455 F. Supp. 2d 157 (E.D.N.Y. 2006) .............................................................................29

*Brady v. Wal-Mart Stores, Inc.*,
    No. 03 Civ. 3843 (JO), 2005 U.S. Dist. LEXIS 12151 (E.D.N.Y. June 21, 2005)............18

*Chopra v. GE*,
    No. 04 cv 358 (WWE), 2007 U.S. Dist. LEXIS 92681 (D. Conn. Dec. 3, 2007) .............33

*Cornwell v. Robinson*,
    23 F.3d 694 (2d Cir. 1994)...................................................................................................9

*Diamond D Enterprises USA, Inc. v. Steinsvaag*,
    979 F.2d 14 (2d Cir. 1992)................................................................................................35

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124 (2d Cir. 1998).................................................................................................8

*Dodson v. CBS Broadcasting*,
    423 F. Supp. 2d 331 (S.D.N.Y. 2006).................................................................................11

*Epstein v. Kalvin-Miler*,
    139 F. Supp. 2d 469 (S.D.N.Y. 2001).................................................................................24

iii

*Farrior v. Waterford Board of Education,*
    277 F.3d 633 (2d Cir. 2002)..............................................................................7

*Fineman v. Industry Network System, Inc.,*
    980 F.2d 171 (3d Cir. 1992).............................................................................20

*Fitzgerald v. Henderson,*
    251 F.3d 345 (2d Cir. 2001).............................................................................10

*Fowler v. New York Transit Auth.,*
    No. 96 Civ. 6796 (JGK), 2001 WL 83228 (S.D.N.Y. Jan. 31, 2001)................23

*Greenbaum v. Svenska Handelsbanken,*
    67 F. Supp. 2d 228 (S.D.N.Y. 1999)...........................................................32, 33

*Greenway v. Buffalo Hilton Hotel,*
    143 F.3d 47 (2d Cir. 1998)..........................................................................14, 16

*Hallinan v. Republic Bank & Trust Co.,*
    519 F. Supp. 2d 340 (S.D.N.Y. 2007)...............................................................7

*Hayles v. Advanced Travel Mgmt. Corp.,*
    No 01 Civ 11017 (BSJ) (DFE), 2004 WL 26548 (S.D.N.Y. Jan. 5, 2004) ........4

*Hofer v. Mack Trucks, Inc.,*
    981 F.2d 377 (8th Cir. 1992) ...........................................................................15

*Howley v. Town of Stratford,*
    217 F.3d 141 (2d Cir. 2000)...............................................................................3

*Hughes v. Patrolmen's Benevolent Association,*
    850 F.2d 876 (2d Cir. 1988).............................................................................29

*Hussain v. Long Island R.R. Co.,*
    No. 00 Civ. 4207 (THK), 2002 U.S. Dist. LEXIS 17807
    (S.D.N.Y. Sept. 20, 2002).................................................................................11

*Ioanne v. Harris,*
    941 F. Supp. 403 (S.D.N.Y. 1996) ..................................................................32

*Ismail v. Cohen,*
    899 F.2d 183 (2d Cir. 1990).............................................................................28

*Jones v. Lincoln Electric Co.,*
    188 F.3d 709 (7th Cir. 1999) ...........................................................................15

*Kauffman v. Maxim Healthcare Serv.*,
    509 F. Supp. 2d 210 (E.D.N.Y. 2007) ...............................................................................34

*Kim v. Dial Serv. Int'l, Inc.*,
    No. 96 Civ. 3327 (DLC), 1997 U.S. Dist. LEXIS 12544, 1997 WL 458783
    (S.D.N.Y. Aug. 11, 1997) ......................................................................................32, 35

*Koufakis v. Carvel*,
    425 F.2d 892 (2d Cir. 1970)................................................................................................20

*Kuper v. Empire Blue Cross & Blue Shield*,
    No. 99 Civ. 1190, 2003 U.S. Dist. LEXIS 2362 (S.D.N.Y. Feb. 18, 2003)................24, 28

*Luciano v. Olsten Corp.*,
    110 F.3d 210 (2d Cir. 1997)................................................................................................33

*Magee v. U.S. Lines, Inc.*,
    976 F.2d 821 (2d Cir. 1992)................................................................................................21

*Marcic v. Reinauer Transport Cos.*,
    397 F.3d 120 (2d Cir. 2005).........................................................................................14, 19

*Marcoux v. Farm Serv. & Supp., Inc.*,
    290 F. Supp. 2d 457 (S.D.N.Y. 2003)................................................................................16

*Matthews v. CTI Container Transpt International Inc.*,
    871 F.2d 270 (2d Cir. 1989)................................................................................................15

*McIntosh v. Irving Trust Co.*,
    887 F. Supp. 662 (S.D.N.Y. 1995) ....................................................................................24

*Medforms, Inc. v. Healthcare Management Solutions, Inc.*,
    290 F.3d 98 (2d Cir. 2002)...................................................................................................7

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992)..................................................................................................8

*Mody v. General Electric Co.*,
    No. 04 Civ. 358, 2006 U.S. Dist. LEXIS 77929 (D. Conn. Oct. 25, 2006)........................19

*Morel v. ABM Co.*,
    No. 02 Civ. 3564 (RWS), 2006 U.S. Dist. LEXIS 91999
    (S.D.N.Y. Dec. 19, 2006)..............................................................................................22, 23

*National R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101, 122 S. Ct. 2061 (2002)..................................................................................9

*O'Neill v. Krzeminski,*
    839 F.2d 9 (2d Cir. 1988)..................................................................................................23

*Ochei v. Coler/Goldwater Mem'l Hosp.,*
    450 F. Supp. 2d 275 (S.D.N.Y. 2006)...............................................................................22

*Osorio v. Source Enterprises, Inc.,*
    No. 05 Civ. 10029 (JSR), 2007 U.S. Dist. LEXIS 18725
    (S.D.N.Y. March 5, 2007)..........................................................................................18, 28

*Pappas v. Middle Earth Condominimium Associate,*
    963 F.2d 534 (2d Cir. 1992)..............................................................................................20

*Parrish v. Sollecito,*
    280 F. Supp. 2d 145 (S.D.N.Y. 2003)...............................................................................31

*Patrolmen's Benevolent Associate v. City of New York,*
    310 F.3d 43 (2d Cir. 2002)....................................................................................26, 27, 29

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006)..............................................................................................18

*Pescatore v. Pan America World Airways, Inc,*
    97 F.3d 1 (2d Cir. 1996)..............................................................................................13, 14

*Phillip Morris, USA v. Williams,*
    127 S. Ct. 1057 (2007)......................................................................................................34

*Phillips v. Bowen,*
    278 F.3d 103 (2d Cir. 2002)..............................................................................................28

*Reiter v. Metro. Transp. Auth. of N.Y,*
    No. 01 Civ. 2762 (JGK), 2003 WL 2271223, 2003 U.S. Dist. Lexis 17391
    (S.D.N.Y. Sept. 30, 2003)..................................................................................................26

*Scala v. Moore McCormack Lines, Inc,*
    985 F.2d 680 (2d Cir. 1993)..............................................................................................27

*Smith v. Piedmont,*
    728 F. Supp. 914 (S.D.N.Y. 1989) ...................................................................................15

*Smith v. Wade,*
    461 U.S. 30, 103 S. Ct. 1625 (1983)................................................................................29

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
    538 U.S. 408, 123 S. Ct. 1513 (2003)...........................................................30, 32

*Taylor v. Brentwood Union Free Sch. Dist.,*
    143 F.3d 679 (2d Cir. 1998)....................................................................................2

*U.S. East Telecommunications, Inc. v. U.S. West Information System, Inc.,*
    No. 87 Civ. 2924 (KTD)(THK), 1993 U.S. Dist. LEXIS 13594
    (S.D.N.Y. September 30, 1993).............................................................................16

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993)........................................................................................7

*Vincent v. Herman,*
    No. 96 Civ. 166, 1998 U.S. Dist. LEXIS 21938 (D. Conn. Sept. 16, 1998) .....................16

*Watson v. E.S. Sutton, Inc.,*
    No. 02 cv 2739 (KMW), 2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sep. 6, 2005) ...........33

*Wheatley v. Beetar,*
    637 F.2d 863, 867 (2d Cir. 1980).........................................................................35

## STATE CASES

*Farrugia v. N. Shore University Hospital,*
    820 N.Y.S.2d 718 (N.Y. Sup. 2006)....................................................................22

*McIntyre v. Manhattan Ford,*
    256 A.D.2d 269 (App. Div. 1998) ......................................................................29

*Jordan v. Bates Advertising,*
    11 Misc. 3d 764 (N.Y. Sup. Ct. 2006) ...............................................................21

*Town of Hempstead v. State Division of Human Rights,*
    233 A.D.2d 451, 649 N.Y.S.2d 942 (2d Dep't 1996).........................................29

## STATUTES

42 U.S.C. § 1981a (b)(4).............................................................................................21

N.Y.C. Admin Code § 8-130 ......................................................................................21

N.Y.C. Local Law No. 85 § 1 (Oct. 3, 2005)..............................................................22

Restatement (Second) of Torts § 908 (1) (1979) ........................................................29

Plaintiff Sydney Nurse submits this Memorandum of Law in Opposition to the Motions Pursuant to Federal Rules of Civil Procedure 50(b), 59(a) and 59(e) (collectively, the "Motion") by Defendants Concepts in Staffing, Inc. ("CIS") and Arthur Abrams (collectively, "Defendants").

## PRELIMINARY STATEMENT

As the Court acknowledged in the middle of the trial in this matter,[1] Plaintiff presented substantial evidence in support of her hostile work environment claims. As a result, after having observed 10 witnesses testify at trial, reviewing 41 exhibits, and receiving specific instructions from the Court, the jury after substantial deliberations correctly found Defendants liable for both sexual and racial harassment. Defendants' effort to overturn this result as a matter of law is entirely without merit. More specifically, a motion pursuant to Rule 50 of the Federal Rules of Civil Procedure can only be granted either where Plaintiff's case was so devoid of evidence as to suggest the jury's verdict was speculation or where Defendants presented overwhelming evidence in their favor. As set forth in detail below, Defendants do not even approach this high standard required for a successful motion under Rule 50. Similarly, Defendants have failed to establish any basis for the extraordinary remedy of a new trial. The Court's carefully limited admission of some time-barred evidence, together with appropriate limiting instructions to the jury was proper and is not a basis for a new trial. Further, under clear precedent, the comments by Plaintiff's counsel do not warrant a new trial, particularly in light of the fact that Defendants failed to object to the majority of these comments and the "plain error" standard therefore applies. The Court also gave the jury detailed curative instructions. Finally, the jury's reasonable award of $700,000 in compensatory damages and $500,000 in punitive damages should be sustained under the highly deferential "shocks the conscience plus" standard that applies to New York City claims.

---

[1]     Trial Tr. at 552.

## ARGUMENT

### I.
### DEFENDANTS' RULE 50 MOTION MUST BE DENIED IN LIGHT OF THE OVERWHELMING EVIDENCE OF HOSTILE WORK ENVIRONMENT

Defendants' arguments for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure echo their entirely unsuccessful motion for summary judgment and are contradicted by the Court's own comments concerning substantial evidence in support of Plaintiff's hostile work environment claim.  Trial Tr. at 552 ("If the jury finds her credible and other witnesses credible, you have got a terrific gender and racial harassment case, hostile work environment case.").  In order for their motion to succeed under Federal Rule of Civil Procedure 50, Defendants must show, either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture" or "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Taylor v. Brentwood Union Free Sch. Dist.,* 143 F.3d 679, 685 (2d Cir. 1998).  Because Plaintiff presented voluminous evidence of racial discrimination, racial discrimination, racial harassment and sexual harassment, Defendants' Motion falls far short of this heavy burden.

### A.    Plaintiff Presented Substantial Evidence of Racial Discrimination and Harassment

Plaintiff's case in chief included extensive, credible testimony concerning the racially hostile work environment at CIS.  Thus, Plaintiff presented testimonial proof of the following:

(a) Defendant Abrams stated to Ms. Nurse that he did not want Blacks or Hispanics on the Company's website (Trial Tr. at 507), and repeated this same comment approximately two times after she specifically informed him that she found it racially offensive. Trial Tr. at 513,-14;

(b) Defendant Abrams' stated in front of Ms. Nurse that he did not want a Black Doll for his granddaughter, that "anything was better than a Black Doll."  Trial Tr. at 515;

(c) CIS employee Les Howard, aka Les Klein ("Les Howard"), referred to Ms. Nurse as a "Black Bitch" on approximately 30 occasions, Ms. Nurse repeatedly complained about this conduct to Defendant Abrams, yet he failed to discipline Mr. Howard. Trial Tr. at 424-25;

2

(d) Defendant Abrams instructed CIS employee Flaviana Lopez to seat a Hispanic employee at the "back of the bus" and to make sure she told Ms. Nurse of his racist remark. Trial Tr. at 322-23, 521-22;

(e) Defendant Abrams called Ms. Nurse "Black Girl" in an offensive manner on approximately 50 occasions, continuing to do so even after Ms. Nurse made it clear that she found the comment to be racially offensive. Trial Tr. at 385-86, 390;

(f) Defendant Abrams referred to Ms. Lopez as a "Dominican from the Bronx." Trial Tr. at 408;

(g) Defendant Abrams made frequent, offensive references to members of the accounting and administrative staff as minorities. Trial Tr. at 90, 172, 409;

(h) Defendant Abrams had a practice of introducing Ms. Nurse to African-American candidates while making references to their common race, which Ms. Nurse found offensive. Trial Tr. at 394-95;

(i) Defendant Abrams made explicit and offensive reference to Doris Perez and a job candidate's common Dominican background. Trial Tr. at 263-64, 402;

(j) In Ms. Nurse's presence, Defendant Abrams stated to Prudence Shilangue, a CIS employee of African heritage, that Ms. Shilangue came from "poverty." Trial Tr. at 414;

(k) Defendant Abrams referred to Hispanics as "wetbacks." Trial Tr. at 408;

(l) Defendant Abrams also openly uttered terms such as "Chinese motherfucker" and "Filipino bastard" in the workplace. Tr. at 404, 407;

(m) CIS employee Brad Adams stated to the accounting/administrative staff that "minorities are supposed to suffer," which was reported to Ms. Nurse by CIS employee Lisamarie Cruz. Trial Tr. at 105-06, 440.

Defendants attempt to undermine this substantial evidence through mathematics, suggesting that because Plaintiff's position involved daily interactions with Defendant Abrams, she was required to show that racially harassing conduct occurred literally thousands of times before it could rise to the level of hostile work environment. This argument is simply absurd. The cases are clear that no minimum number of occurrences is required before a "hostile work environment" occurs[2] and there is no case law to support Defendants' theory that frequent interaction between the offender and Plaintiff somehow requires a greater number of occurrences before an

---

[2]    "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim. . . . [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000) (internal citations omitted).

3

environment can be deemed hostile.  The numerous instances of racially discriminatory acts and/or comments proven at trial are more than sufficient to preserve the jury's verdict.

Similarly, Defendants' characterization of the racial comments as "sporadic" and "infrequent" has absolutely no support in the record.  The evidence at trial demonstrates a series of comments, mostly by Defendant Abrams, starting in Spring 2005 and culminating in a cluster of racist conduct in the summer of 2006, just months before Plaintiff filed her EEOC charge.  Trial Tr. at 90, 172, 322-23, 385-86, 390, 409, 424-25, 513-14, 515, 521-22.  Indeed, the comments are anything but "isolated."  For example, Mr. Howard referred to her as a "Black Bitch" on at least 30 occasions and Defendant Abrams called Plaintiff "Black Girl" on approximately 40 occasions. Trial Tr. at 385-86, 424-25.[3]

Defendants' argument that some of the comments were somehow neutral "references" to race, similarly fails.  Plaintiff presented substantial evidence of the animus behind the Defendants' racial comments.  Plaintiff presented testimony that Defendant Abrams repeated racial references such as "Black Girl," "Dominican from the Bronx" and "minorities" even after Ms. Nurse or others clearly explained to him their offensive nature.  Trial Tr. at 386, 398, 402, 404, 513, 514. The trial testimony further revealed that Defendant Abrams choose an extremely painful historical reference - "back of the bus" - to indicate his view of racial minorities and took the kind act of providing a doll to his granddaughter as an opportunity to express racial hatred, by stating that "Black is ugly."  Trial Tr. at 515, 1188.  Thus, ultimately, Plaintiff has presented more than sufficient evidence to demonstrate discriminatory animus, and Defendants have not presented any

---

[3]    Defendants attempt to show that the phrase "Black Bitch" is insufficient to establish a hostile work environment is simply a repeat of the same failed argument they made on summary judgment and ignores the distinguishing characteristics of this case.  Thus, neither the *Augustin* or *Hayles* cases cited by Defendants warrant a reversal of the jury's verdict.  *Augustin v. Yale Club of New York City*, No. 03 Civ. 1924 (KMK), 2006 WL 2690289 at *22 (S.D.N.Y. Sept. 15, 2006) (alleged conduct consisted of "fucking negrita" and "Black Bitch" each stated on <u>one</u> occasion by co-worker); *Hayles v. Advanced Travel Mgmt. Corp.*, No 01 Civ. 11017(BSJ)(DFE), 2004 WL 26548 at *19-20 (S.D.N.Y. Jan. 5, 2004) (discussing allegations of wrongful constructive termination - not harassment - and granting summary judgment on basis that plaintiff conceded she believed certain alleged racial remarks were made in jest and others were not temporally linked to constructive termination).

overwhelming evidence to the contrary that would warrant overturning the jury's finding in this

regard.

**B.    Plaintiff Presented Substantial Evidence of Sexual Harassment at Trial**

The allegations of sexual harassment, proven at trial, include the following.

(a) In or around the first seven months of 2006, Defendant Abrams called Ms. Nurse into his office and grabbed her right breast with his left hand.  Trial Tr. at 445, 447;

(b) Defendant Abrams pinned Ms. Nurse in a corner of his office, near his desk wrapped his arms tightly around her, and pressed his pelvic region against her buttocks. Trial Tr. at 451-52);

(c) Defendant Abrams grabbed Ms. Nurse around the neck in front of the doorman at the CIS office, saying that Ms. Nurse worked for him and he could do what he wanted to her.  Trial Tr. at 455-57;

(d)  On July 5, 2006, Mr. Howard, approached Ms. Nurse's desk where she was seated and rubbed a check request form on his penis, while pumping his pelvic area near Ms. Nurse's face. Ms. Nurse immediately reported this to Defendant Abrams who laughed in response.  Trial Tr. at 488-89, 525-26;

(e) On approximately 20 occasions Mr. Howard made comments to Ms. Nurse concerning the size of her breasts or made hand gestures referring to he breasts; in one example he stated to Ms. Nurse, "your top is nice, and the shirt looks good too."  Ms. Nurse repeatedly complained to Defendant Abrams who failed to take effective action."  Trial Tr. at 478-79, 481-82;

(f) Erez Shilo, a sales representative at CIS, told Ms. Nurse "I'm so happy I could kiss you," and proceeded to unzip his pants, point to his penis and while thrusting his pelvis forward stated: "here kiss this!"  Ms. Nurse complained to Defendant Abrams who failed to take effective action.  Trial Tr. at 473-74, 475; and

(g) When Ms. Nurse reported that an employee had smacked Olga Ramos, a young teenage girl, on the buttocks to Defendant Abrams, he laughed and stated, "did smack her on the butt or did he grab the butt?  Did he have the butt in his hand?" while making slapping and grabbing gestures.  Trial Tr. at 487.

In addition, during her employment at CIS Ms. Nurse either personally observed (as

indicated) or otherwise learned of the following harassing incidents:

(h) On multiple occasions in 2005 and 2006, in front of Ms. Nurse, Defendant Abrams has touched and played with Lisamarie Cruz's hair in an inappropriate and unwelcome manner. Trial Tr. at 135;

(i) On a number of occasions during Ms. Nurse's employment at CIS, Mr. Howard blatantly leered at Ms. Nurse and her female co-workers, making excuses to lean over their desks and stare at their breasts.  Ms. Nurse complained to Defendant Abrams who failed to take effective action.  Trial Tr. at 481-82; and

Plaintiff has other significant evidence of a sexually hostile work environment, including:

(j) In 2006, Defendant Abrams told Ms. Cruz that he "liked to be on top" and that Ms. Cruz "would be on the bottom," an inappropriate and unwelcome reference to sexual positions.  Trial Tr. at 146; and

(k) In the fall of 2006, Defendant Abrams stated to Ms. Syrrea Houston that she "is sexy," while leering at her buttocks.  Trial Tr. at 464.

Incredibly, Defendants argue that this volume of evidence is insufficient to support a sexually hostile environment claim and not sufficiently continuous and concerted to have altered the conditions of Plaintiff's work environment.   Not only are Defendants' arguments utterly unconvincing factually, they also obviously ignore the standards on a Rule 50 motion.  For example, Defendants attempt to argue that their affirmative evidence that Defendant Abrams was "touchy feely" with men and women and Defendant Abrams' own self-serving testimony that his embraces were reciprocated[4] warrants judgment as a matter of law, without even attempting to explain how their evidence rises to the level of "overwhelming" such that no reasonable juror would have found in Plaintiff's favor.  Indeed, the trial testimony identified numerous examples of touching and highly offensive conduct that was far beyond simply "touchy-feeling" and was directed at women alone. *See supra* pages 5-6 (points (a), (b), (d), (e), (f), (g), (h), (i), (j), (k)).

Defendants' argument that Plaintiff's hostile work environment claim is undermined by her successful work performance is similarly without merit as it merely asks the Court to second guess the jury's findings without a compelling reason to do so.  Defendants presented facts and arguments concerning Ms. Nurse's work performance to the jury who nonetheless found that Plaintiff was subjected to a hostile work environment.  This finding is supported by the substantial evidence that Plaintiff found the sexual comments and touching offensive and that it affected her work.  Trial Tr. at 452, 453, 457, 458, 460, 462, 474, 482, 489, 491.

---

[4]    Defendants misrepresent this evidence to the Court.  Although their Motion can cite only to Defendant Abrams' testimony on this point, Defendants characterize it as "eyewitnesses" - plural.  Def. Mem. at 6.

For all the foregoing reasons, Defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 should be denied.

## II.
## THE WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S VERDICT AND DOES NOT MERIT A NEW TRIAL UNDER RULE 59

Although the Court has greater leeway in granting a Rule 59 motion for a new trial as compared to a Rule 50 motion for judgment as a matter of law, a new trial is nonetheless appropriate only in "the most extraordinary circumstances." *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 346 (S.D.N.Y. 2007) (citing *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993)) (internal quotations omitted), where "the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002). Courts often described this general standard as permitting a new trial where the jury's verdict is "against the weight of the evidence," but this formulation does not remove the requirement that the verdict be egregious. *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ("a decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice").[5]

### A.    Defendants' Motion for a New Trial Should be Denied as a Matter of Law

In support of their motion for a new trial under Rule 59, Defendants first cite to the same ineffective arguments asserted in their motion under Rule 50. For the reasons set forth above, these arguments fail to establish a proper basis for granting a new trial. Defendants then assert that a new trial is proper because Plaintiff lacked credibility. However, "[w]here the resolution of the

---

[5]    Defendants assert that a verdict is against the weight of the evidence if it was so excessive as to suggest that it was motivated by passion, prejudice and/or surmise, but the cases cited by Defendants do no support this proposition. Def. Mem. at 8 (citing *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003); *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996). Regardless, controlling law makes clear that granting a new trial is a remedy to be granted only in limited circumstances to avoid a miscarriage of justice.

issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.").

Moreover, Defendants' challenge to Ms. Nurse's credibility is unconvincing. First Defendants cite to the fact that in a 2005 application for employment practices liability insurance, Ms. Nurse wrote "n/a" in response to an insurance question seeking facts or circumstances that might give rise to future claims within the coverage. In the first instance, Defendants never established Ms. Nurse's intent with respect to this omission or that she understood the legal import of this language. Secondly, this application precedes by nearly a year a number of the most egregious acts of harassment, including: (a) Defendant Abrams grabbing Ms. Nurse's breast, (b) Defendant Abrams stating that anything is better than a Black Doll and that "Black is ugly," (c) Defendant Abrams making the offensive reference to "back of the bus;" and (d) Mr. Howard rubbing a check request on his genitals, then shoving the request in Ms. Nurse's face while making a pumping gesture with his pelvis. Finally, Ms. Nurse gave detailed and convincing testimony concerning the genuine offense she felt at the on-going hostile work environment, *see e.g.*, Trial Tr. at 387, 398, 425, 427, 460, which negates Defendants' suggestion that Ms. Nurse somehow brought this suit for monetary gain, *see* Def. Mem. at 9.

For similar reasons, Ms. Nurse's hiring of Liesel Harper and holiday cards to Defendant Abrams do not undermine Ms. Nurse's credibility, and certainly not to the degree required for the extraordinary step of overruling a jury's credibility determination. As Ms. Nurse testified, Ms. Harper was initially hired in 2004 to perform filing in an area removed from Defendant Abrams. Trial Tr. at 629. At Defendant Abrams' instruction, Ms. Harper became his personal assistant. Trial Tr. at 629-630. With respect to the holiday cards, the timing is significant. As with the

insurance application, the positive remarks in these cards precede many of the egregious acts, Trial

Tr. at 716, 719, and in the case of the December 2005 card, were signed by all employees. *See*

Defendants' Trial Exhibit K. These challenges to the jury's credibility determinations are simply

insufficient grounds for a new trial.

**B.    The Court Properly Admitted Evidence Concerning Prior Harassing Acts**

Defendants argue that a new trial is necessary because the Court improperly admitted

evidence of sexual harassment outside the limitations period. However, Defendants raised these

same arguments at trial, which were rejected by the Court. In support of this motion, Defendants

present no new arguments or evidence to justify overturning these prior rulings which were entirely

consistent with applicable law and properly analyzed under Federal Rule of Evidence 403. Indeed,

the Court excluded a number of the subjects Defendants complained of as time-barred, or in many

instances provided careful limiting instructions designed to minimize any prejudicial effect.

The Supreme Court made clear in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

122 S. Ct. 2061 (2002), that so long as at least one harassing act falls within the limitations period,

alleged harassing acts that occur outside the limitations period may be considered by a jury in

establishing hostile work environment. *Id.* at 116-20, 2074-77. During the trial, the Court further

elaborated on his standard, explaining a party must show the timely and untimely acts are part of a

continuing violation, that is, they were "pursuant to a policy or practice or, alternatively, if there

was a course of management looking the other way." Trial Tr. at 485; *see also Cornwell v.*

*Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) ("a continuing violation may be found where there is

proof of specific ongoing discriminatory policies or practices, or where specific and related

instances of discrimination are permitted by employer to continue unremedied for so long as to

amount to a discriminatory policy or practice").

1.  **The Erez Shilo Incident was Part of a Pattern of Harassment and Failure by Defendants to Address That Harassment**

Defendants argue that the incident involving Erez Shilo was a discrete act since Mr. Shilo never repeated his inappropriate conduct, his conduct was remote in time and unconnected to Ms. Nurse's claims, and addressed by CIS management.[6]  To the contrary, Mr. Shilo's conduct, which occurred at most one year prior to the limitations period, was directed at Plaintiff personally and was consistent with more recent events of sexual harassment she experienced.  As Ms. Nurse testified, Mr. Shilo unzipped his zipper, pointed to his penis, and told Ms. Nurse "here, kiss this." Trial Tr. at 474.  Similarly, in 2006, Mr. Howard rubbed a check request on his penis, then shoved the request in Ms. Nurse's face while pumping his pelvis towards her face.  Trial Tr. at 524.

Significantly, Defendant Abrams failed to address this inappropriate conduct in both situations.  Plaintiff testified that when she informed Defendant Abrams about the incident with Mr. Shilo, he simply laughed.  Trial Tr. at 475.  Plaintiff later testified that when she informed Defendant Abrams of Mr. Howard's highly disgusting conduct, Defendant Abrams again laughed and told Plaintiff to "get over it."  Trial Tr. at 526-28.  Moreover, throughout this time period in between these acts, other harassment occurred which created a continuous hostile work environment.  Trial Tr. at 423-26 (Mr. Howard frequently referring to Ms. Nurse as "Black Bitch" and Defendant Abrams failure to address these comments); Trial Tr. at 478-79 (Mr. Howard's continuous comments to Ms. Nurse concerning the size of her breasts); Trial Tr. at 448 (Defendant Abrams' repeated and unwelcome touching of Ms. Nurse's arms); Trial Tr. at 447 (Defendant Abrams' grabbing of Ms. Nurse's breast).  This series of events is sufficient to create a continuing violation.  *See Fitzgerald v. Henderson*, 251 F.3d 345, 363 (2d Cir. 2001) (finding one timely incident that occurred more than two years following other incidents of harassment sufficient to

---

[6]      Defendants claim that the incident involving Mr. Shilo occurred in 2001, but as Ms. Nurse testifies, it occurred in 2002 or 2003, the latter of which is within the statute of limitations.  Trial Tr. at 472.

establish a continuing violation where plaintiff "alleged that the harassment was "ongoing,"

"repeated," and "continuing""); *Dodson v. CBS Broadcasting*, 423 F. Supp. 2d 331, 335 (S.D.N.Y.

2006) (denying motion *in limine* to exclude time-barred discriminatory act that occurred one and a

half years before similar timely discriminatory acts involving same decision-makers); *Hussain v.*

*Long Island R.R. Co.*, No. 00 Civ. 4207 (THK), 2002 U.S. Dist. LEXIS 17807, at *13-16

(S.D.N.Y. Sept. 20, 2002) (finding continuing violation theory allowed consideration of harassing

comments occurring on occasion over three-year period).  Again, Defendants have offered no new

arguments or evidence that warrants a different ruling.  Indeed, the Court ensured that any potential

for prejudice from testimony concerning Mr. Shilo was explored and found the incident was

admissible.  Trial Tr. at 472-73.

### 2. The Jeff Turner Incident was Carefully Limited by the Court and Demonstrated the On-going Failure by Defendant Abrams to Address Harassment

The testimony concerning Jeff Turner is similarly related to the other timely

events of sexual harassment.  As Ms. Nurse explained, in response to certain sexual conduct by Mr.

Turner, Defendant Abrams – laughed at and asked Ms. Nurse – "did he smack her on the butt or

did he grab the butt?" – "did he have the butt in his hand?"  Trial Tr. at 487.  Defendants raised an

objection as to the timing of the incident, and the Court immediately recognized that the incident

was consistent with other similar events of sexual harassment, "Now, if Mr. Abrams did what the

witness is going to say he did, it seems to me it's management looking the other way."  Trial Tr. at

484-85.  The Court confined the testimony to Defendant Abrams' reaction upon learning about the

incident and provided the jury with a limiting instruction, which further protected Defendants from

any prejudice from this testimony.  Trial Tr. at 483-84, 486.

The evidence is connected to Defendant Abrams' pattern of failing to address harassment by his employees, described above, and Defendants have presented no compelling basis to revisit the Court's ruling on this issue, particularly in light of the Court's limiting instruction.

### 3. The Susan Ackerly Incident was Part of a Pattern of Harassment

Again, the testimony concerning the incident between Susan Ackerly and Defendant Abrams is in conformity with the recent events of sexual harassment experienced by Plaintiff. Ms. Nurse testified that she personally witnessed Defendant Abrams in the hallway placing his hands behind Ms. Ackerly's neck and pulling her close to him while holding her. Tr. at 470. This incident involving Ms. Ackerly is entirely consistent with Defendant Abrams' sexual harassment of Ms. Nurse. For example, in 2005 or 2006, Defendant Abrams grabbed Ms. Nurse around her neck, telling the doorman who witnessed the incident, "[S]he works for me, I can do what I want to her." Trial Tr. at 454-57.

Moreover, the Court recognized the relevance of this incident in establishing a sexually hostile work environment. When Defendants objected to the incident involving Ms. Ackerly, the Court allowed the testimony because Ms. Nurse had personally witnessed Defendant Abrams' inappropriate behavior towards Ms. Ackerly. Trial Tr. at 468-69. Defendants have once again failed to present new arguments or evidence in support of a different ruling.

### 4. Incidents Concerning Defendant Abrams Were Properly Admitted

In light of the testimony concerning the hostile work environment at CIS, the probative value of "time-barred" incidents of sexual harassment involving Defendant Abrams and Plaintiff is obvious. Plaintiff testified to an incident in 2000 or 2001 when Defendant Abrams came up behind her and pressing his body against hers, placed his pelvic region against her buttocks. Trial Tr. at 451-52. Not only does this incident involve sexual harassment personally committed by Defendant Abrams, it is consistent with other incidents of sexual harassment Plaintiff experienced at the

12

hands of Defendant Abrams. For example, Ms. Nurse testified to an incident in 2006 where Defendant Abrams grabbed her right breast. Tr. at 447. Thus, it further shows Defendants' refusal to address this sexually hostile work environment by condoning as well as participating in its perpetuation.

## C.   **Counsel's Comments During Summation Do Not Warrant a New Trial**

Citing to four comments by Plaintiff's counsel during summation, Defendants ask this Court to overturn a reasonable, deliberate and considered jury verdict that was rendered after ten days of trial. Having failed to object to three of the challenged summation comments at the time, Defendants now bear a high burden in attempting to show the statements caused undue prejudice or passion that would warrant the extraordinary remedy of a new trial. As set forth in detail below, Defendants fail to meet this burden.

### 1.   **Defendants' Failure to Object Requires a Showing of Plain Error**

In their Motion, Defendants challenge the following statements by Plaintiff's counsel in his summation: (a) references to "slight of hand" and "Three Card Monty"; (b) references to questions about Plaintiff's childhood as "irrelevant;" and (c) statements that Plaintiff's counsel could have cross-examined Mona Abrams more aggressively and that she was a pawn being used at trial. At the time these comments were made, however, Defendants raised no contemporaneous objection. In fact, the only comment that is challenged here to which Defendants' lodged a contemporaneous objection was: (d) references by Plaintiff's counsel to a line of questioning by Ms. Colwin concerning an insurance document.

As the Second Circuit explained in *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1 (2d Cir. 1996), where a party fails to timely object to an alleged inflammatory or prejudicial closing remark, a new trial will not be granted on the basis of the summation, unless the party can show the remark rises to the level of "plain error." *Id.* at 18 (noting that the higher plain error

standard was appropriate because the failure to timely object deprived the Court of the opportunity to deal with the remarks "then and there"); *see also Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (failure to object deprives the trial court of opportunity to address the errors at trial, and necessitates plain error review); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (applying "plain error" analysis to alleged prejudicial closing remark due to counsel's failure to object).[7]   Thus, Defendants' contention that a new trial is warranted if the comments merely caused prejudice or unfairly influenced the jury is simply incorrect.  With respect to the challenged comments concerning "Three Card Monty," Mona Abrams and the irrelevancy of testimony regarding Ms. Nurse's childhood, Defendants motion for a new trial may only be granted if Defendants can show the error "is so serious and flagrant that it goes to the very integrity of the trial." *Marcic*, 397 F.3d at 124 (citing *Greenway*, 143 F.3d at 51 and *Pescatore*, 97 F.3d at 18).

### 2. Counsel's Comments Regarding Three Card Monty/Slight of Hands, Irrelevance of Testimony and Mona Abrams Do Not Rise to the Level of Plain Error

As a number of cases from the Second Circuit demonstrate, improper and inflammatory closing remarks rarely warrant a new trial, particularly under the plain error standard.  For example, in *Pescatore*, a wrongful death suit stemming from the bombing of PanAm Flight 103, the court examined the following closing remarks:

> In rebuttal summation, plaintiff's counsel stated that, contrary to the contentions of Pan Am's counsel, the money that the plaintiff was seeking was "not funny money. It is not funny money. That is *blood money*. That is what comes from the killing of a young man . . . ."

*Pescatore*, 97 F.3d at 17 (emphasis in original).  The court found that the "blood money" remark

---

[7]    The "plain error" standard for unpreserved summation objections applies both to the appellate review and the trial court's consideration of a Rule 59 motion. *Am. Nat'l Fire Ins. Co. v. Mirasco*, Inc., No. 99 Civ. 12405 (RWS), No. 00 Civ, 5098 (RWS) 2004 U.S. Dist. LEXIS 8803, at * 7-8 (S.D.N.Y. May 24, 2004), *rev'd and remanded in part on other grounds* 44 Fed. Appx. 171, 2005 U.S. App. LEXIS 17475 (2d Cir. N.Y. 2005); *Marfia v. T.C. Ziraat Bankasi*, 903 F. Supp. 463, 473 (S.D.N.Y. 1995).

was a "slippery tactic that arguably constituted a prejudicial call for the jury to award punitive damages, and risked a mistrial." *Id.* at 17-18. The court, nonetheless refused to grant a new trial on the basis of this comment, noting that it did not rise to the level of plain error. *Id.* at 18.

Here, Defendants assert that the remarks by Plaintiff's counsel about "Three Card Monty" and "slight of hands" Mona Abrams were personal attacks on opposing counsel and defense witnesses that warrant a new trial. Such comments on the conduct of counsel and the credibility of witnesses, however, do not rise to the level of plain error. For example, in *Matthews v. CTI Container Transpt Int'l Inc.*, 871 F.2d 270 (2d Cir. 1989), defendants objected to a number of comments made by plaintiff's counsel in summation, including remarks concerning defendants and defendants' counsel. *Id.* at 278. The court upheld the district court's refusal to grant a new trial on this basis concluding that the statements did not amount to undue prejudice. *Id.*

Similarly, in *Jones v. Lincoln Electric Co.*, 188 F.3d 709 (7th Cir. 1999), defendants' counsel, during his summation, suggested to the jury that plaintiff and his counsel were attempting to "trick" them into awarding them money ("They're big companies. We've got some good documents, back in '49 and '50, maybe we can *trick* the jury.") *Id.* at 729. Overruling plaintiff's counsel's objections, the trial court permitted defendants' counsel to continue using the word "trick," even warning the jury "It's the old trick-pack theory. Don't go for the bait." *Id.* at 730. The Court rejected plaintiff's argument that a new trial was warranted due to these personal attacks on plaintiff and his counsel, reasoning that while the "use of the word "trick" and the term "trick-pack" could have had some inflammatory effect such remarks were not "so egregious as to necessitate the grant of a new trial." *Id.*[8]

---

[8]      *See also Smith v. Piedmont*, 728 F. Supp. 914, 919-20 (S.D.N.Y. 1989) (new trial was not warranted despite plaintiff's counsel's "repeated statements regarding defendant's failure to call certain witness and to produce evidence improperly implied that defendant had not been completely candid in its presentation of the case"); *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 382 (8th Cir. 1992) (finding that defendant's counsel's summation "punctuated by

Inappropriate comments directed at the credibility of witnesses, including that of the plaintiff or defendant, have also been found to fall short of plain error. In *Vincent v. Herman*, No. 96 Civ. 166, 1998 U.S. Dist. LEXIS 21938 (D. Conn. Sept. 16, 1998), a sex discrimination action, plaintiff argued that statements made by defense counsel that a witness "lied" to the jury amounted to plain error. *Id.* at *18-20 (after counsel went through the evidence presented at trial and, referencing a witness, told the jury, "So she lied to you."). Despite this direct attack on plaintiff's credibility, the Court held "that although her choice of words was unfortunate . . . there was ample evidence to warrant the jury's determination and the conduct did not have an impact upon that ultimate decision." *Id.* at 19-20.[9]

The Court's detailed curative instructions to the jury further mitigate against a finding of plain error. For example, in *Greenway*, the Second Circuit held that plaintiff's counsel's comments amounting to "gay-bashing" did not constitute plain error "given the context of the entire trial and the judge's instruction that the statements made by the lawyers were not to be considered evidence." *Greenway*, 143 F.3d at 51. Courts, even when reviewing comments by counsel during summation merely for undue prejudice, and not plain error, routinely give weight to the curative instructions provided by the court. S*ee, e.g.*, *Marcoux v. Farm Serv. & Supp., Inc.*, 290 F. Supp. 2d 457, 472 (S.D.N.Y. 2003) (holding that a new trial was not warranted where Court's instructions to the jury that statements by attorneys during summation are not evidence "likely cured the prejudicial effect" of any misconduct by counsel).[10]

---

unwarranted denunciations of [plaintiff's] counsel," while "certainly questionable," did not require reversal of district court's refusal to grant a new trial).

[9]    *See also Alholm v. Am. Steamship Co.*, 144 F.3d 1172, 1181 (8th Cir. 1998) (no reversal where defendant objected "to references to it as "a gang of bullies" and its counsel as a "spin doctor" since prejudice was avoided by district court's sustaining objection to the former and instructions to the jury as to the latter).

[10]    *See also Beyar v. City of New York*, No. 04 cv 3765 (JFB) (KAM), 2007 U.S. Dist. LEXIS 47447, at *15-16 (E.D.N.Y. June 29, 2007) (holding that a new trial was not warranted where "even if defense counsel's remarks were improper, the Court finds that any potential prejudice was cured by the jury instructions"); *U.S. East Telecommunications, Inc. v. U.S. West Information Sys., Inc.*, No. 87 Civ. 2924 (KTD)(THK), 1993 U.S. Dist. LEXIS

16

In the present case, the Court provided a far more detailed curative instruction to the jury than the instruction found to be sufficient in *Greenway*. Thus, with respect to references to "slight of hands" and "Three Card Monty," the Court specifically instructed the jury to disregard the argument since such comments "have no proper place at trial." Trial Tr. at 1402-03. Next, the Court informed the jury that Plaintiff's counsel's comments about Mona Abrams must be disregarded "[t]o whatever extent that you took that as an implication that there are facts that were not brought out here before the court." Trial Tr. at 1403. Finally, with respect to comments that evidence relating to Plaintiff's childhood was irrelevant, the Court instructed the jury that "it is not up to [Plaintiff's counsel] to decide what evidence is relevant and is not relevant. It's up to the court. That evidence is before you because it is relevant." *Id.*

It is undeniable that the Court took great care in addressing the challenged statements, discussing each individually and providing the jury with a corresponding instruction tailored to the remark. Thus, the Court's detailed curative instructions to the jury were more than adequate in the context of the trial to negate any question of plain error.

### 3. Comments Regarding Counsel's Insurance Policy Questioning Did Not Cause Undue Prejudice

As noted above, of the four challenged comments in Plaintiff's summation, Defendants objected to only one of them, specifically, comments by Plaintiff's counsel regarding the questions Defendants' counsel posed with respect to an insurance application Plaintiff had filled out. Given the objection, this comment is reviewed for unfair prejudice keeping in mind the general standards limiting the award of a new trial to extraordinary cases where failure to do so would amount to a miscarriage of justice. As set forth below, there is no basis to believe that Plaintiff's counsel's remarks regarding the insurance questioning were unfairly prejudicial.

---

13594, at *100 (S.D.N.Y. September 30, 1993) (holding that a new trial was not warranted where "[w]hen objections were made, they were generally sustained, plaintiff's counsel was admonished and curative instructions were given to the jury").

During direct examination of Plaintiff, Defendants' counsel mischaracterized a question posed on the application, which the Court recognized. Trial Tr. at 571; 581-82. Plaintiff's counsel referenced this mischaracterization during his summation, repeating the phrase "slight of hands." Trial Tr. at 1371. Again, the cases cited above indicate that such summation comments directed towards opposing counsel do not justify the extraordinary remedy of a new trial. Moreover, as with the other three comments, any resulting prejudice to Defendants from this comment was negated when the Court sustained the objection raised by Defendants' counsel, immediately told Plaintiff's counsel in front of the jury, "That will be enough of the personal attacks, counsel," and informed the jury at that moment to disregard the comment regarding slight of hands. Trial Tr. at 1371. *See also Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (finding no undue prejudice where district court's "prompt curative instruction" as to plaintiff's counsel's improper remarks suggesting that damages would be paid by non-parties was "given to the jurors immediately upon their return to the courtroom). The comments concerning the insurance policy questioning and slight of hand are therefore an insufficient basis for a new trial.

### 4. The Jury's Award Negates any Claim of Error or Prejudice

The jury's damages award further demonstrates the summation comments do not rise to the level of plain error or unfairly prejudicial and negate Defendants' assertion that Plaintiff's closing remarks somehow inflamed the jury. Following two days of thoughtful jury deliberations, the jury's award of $700,000 in compensatory damages and $500,000 in punitive damages, although substantial, is not sufficiently extreme as to suggest the jury was acting under irrational passion, particularly when compared to other far higher verdicts that have been awarded. *See, e.g.*, *Brady v. Wal-Mart Stores, Inc.*, No. 03 Civ. 3843 (JO), 2005 U.S. Dist. LEXIS 12151, at *5-6 (E.D.N.Y. June 21, 2005) (jury awarded plaintiff $2.5 million in compensatory damages and $5 million in punitive damages in a disability discrimination case); *Osorio v. Source Enterprises, Inc.*, No. 05

Civ. 10029 (JSR), 2007 U.S. Dist. LEXIS 18725, at *5 (S.D.N.Y. Mar. 5, 2007) (jury awarded a

total of $7.5 million in damages in plaintiff's gender discrimination and defamation case); *Mody v.*

*Gen. Elec. Co.*, No. 04 Civ. 358, 2006 U.S. Dist. LEXIS 77929, at *2 (D. Conn. Oct. 25, 2006)

(jury awarded $591,423 in back pay, $500,000 in compensatory damages, and $10 million in

punitive damages, totaling close to $12 million in employee's retaliation case); Richard Sandomir,

*Jury Finds Knicks and Coach Harassed a Former Executive*, *N.Y. Times*, Oct. 3, 2007 (reporting

that jury awarded plaintiff $11.6 million in punitive damages in employee's sexual harassment

case). Moreover, the punitive damages award was far less than the award of compensatory

damages, further suggesting that the jury was not impassioned by a desire to punish Defendants

and instead, gave careful thought to the appropriate award. Thus, Defendants' claim that

summation comments improperly inflamed the jury simply does not withstand scrutiny.

### 5. The Evidence in Support of the Verdict Demonstrates No Error or Prejudice

The challenged summation comments also do not rise to the level of plain error or unfair

prejudice due to the overwhelming evidence in support of the verdict and the place of the

comments in the context of the lengthy trial. As the Second Circuit explained, "where the jury's

verdict finds substantial support in the evidence, counsel's improper statements will frequently be

*de minimis* in the context of the entire trial." *Marcic*, 397 F.3d at 124. In *Marcic* for example, the

Court held that a new trial was not required despite defendant's counsel's "rather inflammatory

statements, some of which were framed as personal opinion" where "they were not objected to, and

occurred in the context of a summation spanning thirty-seven pages of trial transcript, at the end of

a week-long trial in which voluminous evidence was introduced that sufficed to support the jury's

verdict." *Marcic*, at 127-28. Here, the verdict is well supported as discussed above, further

demonstrating that the challenged comments by Plaintiff's counsel fall far short of the high

standard required to justify a new trial.

19

**6.    Defendants' Cases Are Distinguishable**

Defendants' reliance on three cases where a new trial was granted based on comments made by counsel during summation is unpersuasive given that they are distinguishable from the present case. *See Pappas v. Middle Earth Condo. Assoc.*, 963 F.2d 534, 539, 541 (2d Cir. 1992) (summation comments warranted new trial where they appealed to regional bias and no curative instruction was provided, noting that "no verdict may stand when it is found in any degree to have been reached as a result of appeals to regional bias or prejudice"); *Koufakis v. Carvel*, 425 F.2d 892, 901, 905 (2d Cir. 1970) (new trial granted where Plaintiff's counsel made numerous references to the Mafia, highlighted defendant's wealth, presented the case as pitting the poor against the rich, repeatedly referenced defendant's failure to testify, made references to other litigation outside the record, and district court failed to provide a curative instruction).

In *Fineman v. Industry Network System*, Inc., 980 F.2d 171 (3d Cir. 1992), a non-binding decision, the district court ordered a new trial based on the summation given by plaintiff's counsel, despite cautionary instructions provided to the jury. *Id.* at 206-07.    The court's grant of a new trial, however, was based in large part on its conclusion that the jury's verdict was not well supported by the evidence and that counsel's remarks contributed to the jury's questionable verdict. *Id.* at 211 (noting the "extraordinary number of inferences that the jury must have drawn in order to reach the verdict it did" in the context of the "wealth of questionable remarks made by plaintiff's trial counsel," and ultimately concluding that the jury's verdict bordered on "speculation").    As noted above, Defendants cannot make a similar showing here.    The weight of the evidence and the nature of the jury's award all tend to show the jury came to a proper verdict based on the evidence and was not unduly influenced by counsel's remarks.[11]

---

[11]    Further, in *Fineman*, the comments concerning opposing counsel went beyond suggesting to the jury that defendant's counsel misrepresented facts, but also asserted that defendant's counsel had done so in order to obtain his

For all the foregoing reasons, the comments by Plaintiff's counsel during summation are not a basis for a new trial and the Defendants' motion in this regard should be denied.

### III.
### THE JURY'S AWARD FOR COMPENSATORY AND PUNITIVE DAMAGES DOES NOT SHOCK THE CONSCIENCE AND SHOULD BE UPHELD

**A.     Pursuant to the New York City Human Rights Law, a "Shocks the Judicial Conscience Plus" Standard Applies**

Defendants correctly cite *Magee v. U.S. Lines, Inc.*, 976 F.2d 821, 822 (2d Cir. 1992), for the proposition that "where only a single award of damages, not segregated into separate components, is made, the preferable rule, we think, is that the successful plaintiff be paid under the theory of liability that provides the most complete recovery." *Id.* Defendants are mistaken, however, in concluding that application of this principle to the case at bar means that "the entire jury award should be considered as if it were allocated to Plaintiff's state claim and reviewed under a deviates materially standard. To the contrary, the theory of liability that provides the most complete recovery for Plaintiff is undoubtedly the New York City Human Rights Law ("CHRL"), which allows for the recovery of uncapped compensatory and punitive damages, and instructs courts to construe its provisions liberally to provide greater recovery than either Title VII or the New York State Human Rights Law ("NYSHRL"). *See* N.Y.C. Admin Code § 8-130; *see also Jordan v. Bates Adver.*, 11 Misc. 3d 764, 771 (N.Y. Sup. Ct. 2006) ("it was the intention of the Council that judges interpreting the City's Human Rights Law not be bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed") (citations omitted).[12]

---

legal fees of $1.1 million. *Id.* at 209. This inference of financial motive is well beyond the improper inferences ascribed to Plaintiff's counsel's comments in this case. Trial Tr. at 1390-91.

[12]     Plaintiff is also entitled to recover uncapped compensatory and punitive damages based on her race-discrimination claims under Section 1981. 42 U.S.C. § 1981a(b)(4). Defendants apparently concede that "federal 'shock the conscience' standards" – rather than the more restrictive state "deviates materially" standards – apply to the evaluation of a jury's damages awards pursuant to federal causes of action such as Section 1981. *See* Def. Mem. at

Although federal and New York state courts traditionally have applied the same standards in evaluating claims under the NYSHRL and the CHRL, the New York City Council's passage in 2005 of the Local Civil Rights Restoration Act amended several provisions of the CHRL to ensure that the CHRL "be liberally and independently construed with the aim of making it the most progressive in the nation." *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718, 747 (N.Y. Sup. 2006) (citing N.Y.C. Local Law No. 85 § 1 (Oct. 3, 2005) ("Local Civil Rights Restoration Act of 2005") (the "Restoration Act"). Consistent with these explicit statements of legislative intent, "at least two New York state courts recently have held that the CHRL holds employers to a higher standard than Title VII and the NYSHRL, and should be "liberally and independently construed." *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 283 (S.D.N.Y. 2006) (citing *Jordan*, *supra*, *Farrugia*, *supra*); *Morel v. ABM Co.*, No. 02 Civ. 3564 (RWS), 2006 U.S. Dist. LEXIS 91999, at *18 (S.D.N.Y. Dec. 19, 2006) (same).

In effectuating a liberal and independent construction of the CHRL that affords the most progressive protections in the nation to victims of employment discrimination, "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpretation . . . viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise." *Farrugia*, 820 N.Y.S.2d at 754 n.3 (quoting *Jordan*, 11 Misc.3d at 770 n.1) (emphasis added); *see also Jordan*, 11 Misc. 3d at 770 ("in enacting the more protective Human Rights Law, the New York City Council has exercised a clear policy choice which this court is bound to honor"). "Thus, the case law that has developed in interpreting both the State Human Rights Law and Title VII should merely serve as a base for the New York City Human Rights Law, not its

---

16. Regardless, Plaintiff can achieve the most complete recovery under the CHRL's "shocks the conscience plus" standard, which regards federal and state standards as establishing minimum and covers Plaintiff's gender discrimination claims as well.

22

ceiling." *Id.* at 747 (citations omitted); *Ochei*, 450 F. Supp. 2d at 283 (same); *Morel,* 2006 U.S. Dist. LEXIS 91999, at \*18 (same).

Moreover, with respect to judicial review of juries' compensatory damages awards in particular, "[o]ne of the core principles intended by the Council to guide decision makers is that 'victims of discrimination suffer serious injuries, for which they ought to receive full compensation.'" *See* Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored Human Rights Law*, 33 Fordham Urban L. J. 255, 309-10 (2006) (quoting legislative history of 2005 Amendments to CHRL). The CHRL "thus counsels judges to defer more to a jury's consideration of the nature of the discriminatory injury" and to ensure that plaintiffs are fully compensated – even if federal or state standards might support a more limited recovery. *Id.*

In light of the Restoration Act, the "deviates materially" standard applied by New York state courts – and urged upon the Court in this case by Defendants – is therefore plainly incompatible with the directive to treat federal and state standards as mere baselines that the CHRL is designed to exceed.[13] "The 'deviates materially' standard for reviewing jury awards is less deferential to a jury verdict than the federal 'shocks the conscience' standard because it does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries . . ." *Fowler v. New York Transit Auth.*, No. 96 Civ. 6796 (JGK), 2001 WL 83228, at \*10 (S.D.N.Y. Jan. 31, 2001). In contrast, under the federal "shocks the conscience" standard, a court will overturn or reduce a jury verdict for damages only where "the award is so high as to shock the judicial conscience and constitute a denial of justice" for the complaining party – even if the amount awarded ultimately exceeds other awards for similar injuries. *See O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988).

Accordingly, the federal "shocks the conscience" standard – which is more deferential to

---

[13]    In this respect, Defendants' multiple citations to cases discussing the NYSHRL standard are distinguished. *See* Def. Mem. at 18-19.

23

the jury's determination and therefore more favorable to Plaintiff than the "deviates materially" standard urged by Defendants – creates the appropriate <u>floor</u> beneath which the CHRL cannot fall for purposes of Defendants' application for remittitur of damages in this case.

**B.    The $700,000 Compensatory Award is Sustainable Under this Standard**

### 1.    Plaintiff's Claim for Emotional Distress is Not Garden Variety

Defendants' assertion that Plaintiff's emotional distress is "garden variety" does not withstand scrutiny. Def. Mem. at 21. It is well-established that "[a] garden variety emotional distress claim is one that did not require medical treatment." *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 U.S. Dist. LEXIS 2362, at *34 (S.D.N.Y. Feb. 18, 2003) (quoting *Epstein v. Kalvin-Miler*, 139 F. Supp. 2d 469, 480 (S.D.N.Y. 2001). Plaintiff "testified that [s]he sought professional help from a clinical psychologist" – for the first time in her life – to cope with the emotional distress that Defendants' discrimination and harassment inflicted upon her. Trial. Tr. at 557-58, 658. Plaintiff's testimony alone is sufficient proof of medical treatment to remove her claim from the realm of "garden variety" emotional distress. *See Kuper*, 2003 U.S. Dist Lexis 2362 at *34, *38; *see also McIntosh v. Irving Trust Co.*, 887 F. Supp. 662, 666 (S.D.N.Y. 1995) ("proof of mental anguish or emotional distress does not have to include medical testimony and it may consist of the plaintiff's testimony, alone, as corroborated by reference to the circumstances of the alleged misconduct").

### 2.  Plaintiff Presented Substantial Evidence of Her Severe Emotional Distress

In addition to testimony concerning her psychological treatment, as described below, Ms. Nurse also presented "evidence of the duration of the distress, its severity or consequences [and] its causal connection to the defendant's actions." *Kuper*, 2003 U.S. Dist Lexis 2362 at *40 (suggesting that absence of evidence as to these elements of emotional distress may justify remittitur of the jury's compensatory damages award). Plaintiff's testimonial evidence was more

than sufficient to support the jury's award of compensatory damages in this case, particularly under the highly deferential "shocks the conscience plus" standard under the CHRL.

By way of example only, Plaintiff described the severity of her emotional distress and its causal connection to Defendants' actions as follows :

> I have been very depressed over the situation. I felt fearful that I would be unemployed. I was losing my self-esteem. I began to feel nervous when sales reps or men came around me and stood next to me thinking about the Les Howard situation. I had great anxiety. I was having chest pains and vomiting. It was difficult for me to get a full night's sleep. I would wake up during the night. I was extremely depressed and I had a lot of fear. I felt worthless. I was questioning why God made me black. I felt embarrassed at times or questioned my skin color and how society looked at me as an African-American in the workplace.

Trial Tr. at 557. Plaintiff also testified, *inter alia*: (i) that being called "Black Girl" at the workplace on at least 45 occasions made her feel humiliated and degraded. Trial Tr. at 387; (ii) that being referred to by Defendant Abrams as "his Black Controller" made her feel embarrassed, humiliated and degraded. Trial Tr. at 398; (iii) that "there were times that [she] cried over it or that it made [her] feel sad for the day." Trial Tr. at 401; (iv) that she felt humiliated and degraded when Defendant Abrams stated that it's difficult for a black woman "coming from poverty." Trial Tr. at 414; (v) that she felt degraded, humiliated, embarrassed and hopeless when Les Howard would call her a "Black Bitch." Trial Tr. at 425; (vi) that being called a "Black Bitch" robbed her of her self esteem and ability to focus on her job. Trial Tr. at 427; (vii) that she felt physically uncomfortable in Defendant Abrams' presence as a result of his sexual harassment and inappropriate physical proximity to her. Trial Tr. at 445; (viii) that on the approximately ten occasions when Defendant Abrams "pinned" her against the wall she felt "[v]iolated, embarrassed, ashamed, confused [and] uncomfortable." Trial Tr. at 460; and (ix) that the totality of these discriminatory experiences led her to seek psychological counseling to cope with her resulting feelings of depression, fear and insomnia. Trial Tr. at 556-57.

Plaintiff's testimony plainly established the duration, extent and consequences of the emotional distress that she suffered, including her need for psychological treatment as a result of Defendants' discriminatory and harassing conduct. Thus, this case is readily distinguishable from the cases involving mere "garden variety" claims for emotional distress that Defendants' rely upon in characterizing the jury's award of compensatory damages in this case as excessive. *See* Def. Mem. at 19-21 (citing, *inter alia*, *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762 (JGK), 2003 WL 2271223, at *9 (S.D.N.Y. Sept. 30, 2003); *Patrolmen's Benevolent Assoc. v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002); *Annis v. County of Westchester*, 136 F.3d 239, 248-49 (2d Cir. 1998); *Binder v. Long Island Lighting Co.*, 847 F. Supp. 1007, 1027 (E.D.N.Y. 1994), *aff'd in relevant part*, 57 F.3d 198 (2d Cir. 1995)).

For example, the evidence of emotional distress in *Reiter* was limited to the plaintiff's testimony that he felt "stressed, nervous, on edge, and clammy, but he also admitted that he never had trouble eating or sleeping and he never sought medical or psychological help." *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762 (JGK), 2003 U.S. Dist. Lexis 17391, at *27 (S.D.N.Y. Sept. 30, 2003). In contrast, Plaintiff's testimony as to the nature and extent of her emotional distress in this case was far more substantial, and unlike *Reiter*, included testimony regarding the psychological help that she sought and obtained as a result of Defendants' discriminatory conduct, as discussed above.

Similarly, although Defendants cite *Patrolmen's Benevolent Association* for the proposition that "[a] plaintiff's testimony, standing alone, is generally insufficient" to substantiate a claim for emotional distress, the next two sentences of the court's opinion (which is not reflected in Defendants' Motion) provide that the plaintiff's testimony of emotional injury may be substantiated "by other evidence that such an injury occurred, such as the testimony of witnesses to plaintiff's distress, or the objective circumstances of the violation itself." *Patrolmen's Benevolent*

*Ass'n.*, 310 F.3d at 55 (citations omitted) (cited in Def. Mem. at 20). Moreover, "[e]vidence that a

plaintiff has sought medical treatment for the emotional injury, while helpful, *is not required.*" *Id.*

(emphasis added).

In the case at bar, however, Plaintiff's testimony was substantiated by her own testimony

concerning the emotional treatment that she sought and by her co-workers who testified at trial.

For example, Steven Edelman, Defendant Abrams' business partner, testified that he noticed a

change "of an emotional state" with respect to Plaintiff beginning in 2006, when Defendant

Abrams told her that he did not want Black or Hispanic employees to be pictured on the

Company's website. Trial Tr. at 737, 741. More specifically, Mr. Edelman testified that he

"started seeing Sydney Nurse crying in the accounting office, crying in the hallways, [and] crying

outside" the office building. *Id.* Mr. Edleman also testified that Plaintiff began smoking, shaking

nervously, lost her confidence, and that "from her face, she always had this positive energy, this

glow about her, and I started seeing that fade away" as well. *Id.* Defendants' citations to *Annis*,

136 F.3d at 248-49, and *Binder*, 847 F. Supp. at 1027 – in which the respective plaintiffs'

evidence of emotional distress was limited exclusively to their own uncorroborated testimony – are

for the same reasons readily distinguished from the case at bar.[14]

### 3. The Jury's Award of $700,000 in Compensatory Damages Does not Shock the Conscience and Should be Confirmed

In evaluating whether a particular award is so high as to shock the judicial conscience and

constitute a denial of justice, "courts have reviewed awards in other cases involving similar

injuries, bearing in mind that any given judgment depends on a unique set of facts and

circumstances." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993). In this

context, however, the courts' "task is not to balance the number of high and low awards and reject

---

[14] These facts also distinguish the case at bar from the other cases cited by Defendants (Def. Mem. at 22-24), in which the evidence of emotional distress was limited solely to Plaintiff's uncorroborated testimony.

the verdict in the instant case if the number of lower awards is greater. Rather, [courts] inquire whether the [jury's] verdict is *within a reasonable range*." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990) (citations omitted) (emphasis added); *see also Kuper*, 2003 U.S. Dist Lexis 2362 at *47 ("because of inflation, an amount that may have been excessive five to ten years ago may be reasonable today"). Moreover, where a verdict is one for emotional distress, the Second Circuit is "willing to uphold substantial awards where warranted." *Id.* (citations omitted).

For example, in *Osorio v. Source Enterprises*, No. 05 Civ. 10029 (JSR), 2007 U.S. Dist. Lexis 18725 (S.D.N.Y. Mar. 5, 2007), the court upheld the jury's award of $4 million in compensatory damages for plaintiff's retaliation claim. Although the court acknowledged "that the $4 million is damages on the retaliation claim is a very full verdict," it emphasized that this amount was reasonable because "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry . . ." *Id.* at *15-16. Like the plaintiff in *Osorio*, the Plaintiff in the case at bar offered comparable testimony as to the nature and extent of her emotional distress, as well as its causal connection to Defendants' discriminatory conduct.

In addition to the $4 million compensatory damages award that was upheld in *Osorio*, the awards upheld in other cases also demonstrate that the jury's award of $700,000 for Plaintiff's emotional distress is within a reasonable range of compensatory damage awards and, thus, does not exceed the threshold of what "shocks the conscience," particularly when this standard is liberally and broadly construed in Plaintiff's favor pursuant to the CHRL, and bearing in mind that "because of inflation, an amount that may have been excessive five to ten years ago may be reasonable today." *Kuper*, 2003 U.S. Dist Lexis 2362 at *47; *see also Phillips v. Bowen*, 278 F.3d 103, 111-12 (2d Cir. 2002) (upholding award of $400,000 for emotional damages in a retaliation case);

28

*Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157 (E.D.N.Y. 2006) (approving award of $600,000 in compensatory damages for emotional distress is discrimination case); *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 884 (2d Cir. 1988) (allowing award of $575,000 against defendant police officers for protracted course of harassment against fellow officer).

Significantly, even courts applying the more stringent "deviates materially" standard – which, as discussed above, does not apply to Plaintiff's claims under the CHRL – have awarded compensatory damages within a reasonable range as the jury awarded Plaintiff in this case.  For example, in an employment discrimination case involving claims under the NYSHRL and CHRL – decided prior to the liberalizing Restoration Act amendments to the CHRL – the New York State Appellate Division confirmed a jury's compensatory damages award of $600,000 to a plaintiff whose emotional distress emanated from sexual harassment by her employer.  *See McIntyre v. Manhattan Ford*, 256 A.D.2d 269 (App. Div. 1998); *see also Town of Hempstead v. State Div. of Human Rights*, 233 A.D.2d 451, 649 N.Y.S.2d 942, 942 (2d Dep't 1996) (upholding emotional distress awards of $200,000 to $500,000 for each of six plaintiffs who suffered mental anguish due to "lewd and offensive" workplace harassment).

Accordingly, there is no reason to disregard the conclusions of the jury and the underlying objectives of the CHRL by granting Defendants' request for remittitur.

**C.    The Jury's Award of Punitive Damages is Supported by The Evidence and is in Line with Awards in Similar Cases**

As courts have consistently recognized, punitive damages serve a different purpose than compensatory damages.  Specifically, punitive damages are designed "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54, 103 S. Ct. 1625, 1639-40 (1983) *quoting* Restatement (Second) of Torts § 908(1) (1979).  In assessing the validity of a punitive damages award, courts focus on three

factors, "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513, 1520-21 (2003).

### 1.    Reprehensibility

As Defendants correctly note, the degree of reprehensibility of misconduct is determined by assessing whether or not "the harm caused was physical as opposed to economic; . . . the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419. Based on these factors, the evidence on the record clearly supports the jury's finding of punitive damages here. In analyzing reprehensibility, Defendants ignore, or unilaterally minimize the two main factors demonstrating that the conduct was reprehensible, namely their repeated actions and intentional malice.

First, the sheer volume of comments and conduct made to Plaintiff and Defendants' unapologetic, and often highly offensive, responses to Plaintiff's numerous complaints demonstrates that not only was this conduct not accidental, but that Defendants relished creating a work environment that was hostile towards women and minorities. At trial, Plaintiff presented evidence of over dozens of incidents of racial and sexual harassment.[15]

Moreover, there is significant evidence of intentional malice. Namely, Ms. Nurse repeatedly complained to Defendant Abrams who showed no concern or regard for complying with the law. For example, when Plaintiff complained to Defendant Abrams about the fact that he

---

[15]    Trial Tr. at 80-81, 269-70, 302-303, 384-86, 387-89, 389-91, 390-92, 82-83, 394-96, 398-99, 404, 392-94, 399-400, 95-96, 504-509, 514, 101-02, 272-73, 307-10, 415, 423-26, 171-72, 412-14, 434-37, 152-53, 153-54, 458-61, 284-85, 449-53, 453-55, 155-56, 274-75, 477-79, 479-80, 159-60, 310-12, 487-91.

referred to her as "Black Girl" on more than 50 occasions, Defendant Abrams responded by stating that, "I don't give a fuck. It's my place. I say what the fuck I want." Trial Tr. at 387-89. Similarly, in response to Ms. Nurse's complaints of discrimination about the way Defendant Abrams treated another employee, he stated, "fuck the law." Trial Tr. at 470-71. In response to Plaintiff's complaints to Defendant Abrams that refusing to have minorities on the website was discriminatory, he screamed, "stop being so sensitive, get over it, it's my place. I say what I want." Trial Tr. at 98. When Plaintiff told Defendant Abrams that referring to individuals by their race was discriminatory, he told her that he did not care and had no intention of changing his ways. Trial Tr. at 404. When Plaintiff complained about Les Howard's conduct by rubbing the check against his groin and thrusting his groin in her face, Defendant Abrams laughed, told her to stop being so sensitive and stated, "You know they are wild in here." Trial Tr. at 161-66. *See, e.g.,* *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 163 (S.D.N.Y. 2003) (holding that defendants' indifference and carelessness to employee's complaints of discrimination justified award of punitive damages).

In this respect, Defendants' claim that Ms. Nurse did not suffer physical harm is a red herring. Although physical harm is one factor warranting punitive damages, it is not required. As set forth above, there are other equally compelling factors in support of punitive damages here. Moreover, as the above-described testimony clearly shows, far from Defendants' contention that Defendant Abrams was apologetic for making "offhand" remarks, he was fully aware that he was violating the law and relished his power and his ability to do so at CIS.[16] In fact, Defendants' assertions that Abrams and CIS took the incidents of harassment seriously and addressed them are plainly contradicted by clear testimony. As noted above, Defendant Abrams laughed in response

---

[16]    Although Defendants attempt to shirk Defendant Abrams' responsibilities by stating that he delegated duties to Human Resources and to Plaintiff, the fact remains that at all times Defendant Abrams was the President of CIS, Plaintiff's supervisor and the main perpetrator of the discriminatory and harassing conduct to which Plaintiff and others were subjected - the suggestion that Ms. Nurse was somehow responsible for stopping his conduct is absurd.

to numerous incidents of sexual harassment and told her to "stop being so sensitive" and to "get over it." Trial Tr. at 98, 161-66, 387-89.

Finally, Defendants incorrectly allege that Ms. Nurse was never financially vulnerable. To the contrary, the main harasser in this case, Defendant Abrams, is the <u>President</u> of CIS, who could fire Ms. Nurse, as an at-will employee, at any time. Indeed, Defendants' assertion that Ms. Nurse was never in serious danger of termination is entirely belied by the testimony. Trial Tr. at 470-471, 541, 542-43, 554-55 (noting Defendant Abrams' threat to Ms. Nurse's employment and threat to fire Susan Ackerly for similarly complaining about harassment).

### 2. Proportionality of Damages

The jury's punitive damages award was proportionally in line with the compensatory damages award. Here, the $500,000 in punitive damages is less than the $700,000 given in compensatory damages. Such a punitive damages award is well within the single digit multiplier range espoused by the Supreme Court in *State Farm*. 538 U.S. at 425, 123 S. Ct. at 1524-25 (noting that "single-digit multipliers are more likely to comport with due process, while still achieving the . . . goals of deterrence and retribution"). Accordingly, the cases cited by Defendants may be easily distinguished. For example, in *Ioanne w. Harris,* 941 F. Supp. 403 (S.D.N.Y. 1996), the award of punitive damages was reduced because it was ten times greater than the compensatory damages award. *Id.* at 413-15. Similarly, in *Kim v. Dial Serv. Int'l, Inc.*, No. 96 Civ. 3327 (DLC), 1997 U.S. Dist. LEXIS 12544 (S.D.N.Y. Aug. 11, 1997) the punitive damages award was 30 times greater than the amount the plaintiff ultimately received for compensatory damages. *Id.* at *44-46.

### 3. Comparable Cases

Where, as here, the punitive damages award is in line with the award of compensatory damages, and the conduct of the defendant is wanton or showed a blatant disregard for the plaintiff's rights, courts have been inclined to award similar figures. For example, in *Greenbaum*

32

*v. Svenska Handelsbanken*, 67 F. Supp.2d 228 (S.D.N.Y. 1999), the court approved an award of punitive damages amounting to $1.25 million. *Id.* at 271-72. In reaching this conclusion, the court relied on the fact that discriminatory comments made by the defendants made it clear that they acted with malice, that it occurred over a period of years and that the defendants could not contend that they were under the impression that their actions did not violate the law. *Id.* at 268-70.

As another example, in *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739 (KMW), 2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sep. 6, 2005), the court found punitive damages appropriate where the wrongdoer had a long history of inappropriate conduct that the employer ignored or refused to address despite numerous complaints. *Id.* at *9-10. As in the instant case, the wrongdoer in *Watson* also made numerous sexual comments to female employees, including the plaintiff. *Id.* at *12-13. Accordingly, based on these factors, the court found $717,000 in punitive damages to be appropriate. *Id.* at *57; *see also Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) (holding that plaintiff was entitled to maximum $300,000 available under Title VII in punitive damages where Defendants repeatedly discriminated against her and openly disregarded plaintiff's civil rights); *Chopra v. GE*, No. 04 Civ. 358, 2007(WWE), U.S. Dist. LEXIS 92681 (D. Conn. Dec. 3, 2007) (approving punitive damage award of $5 million in Title VII, ADEA, FLMA and state law discrimination action).

Defendants' argument that the punitive damages award should be remitted on account of the fact that Defendants cannot satisfy the judgment is similarly without merit. Although Defendants claim that neither CIS nor Defendant Abrams has the resources to satisfy the punitive damages award, they have offered no evidence to support that proposition. Rather, the evidence on record clearly demonstrates that CIS has a high annual income, that Defendant Abrams' home itself is more than enough to satisfy the judgment against him, and that Defendant Abrams' wife, Mona Abrams, has been receiving a substantial amount of money from both CIS and Defendant

Abrams in a transparent attempt to conceal Defendants' assets.[17]  Accordingly, there is no basis for

finding that Defendants are unable to satisfy the punitive damages judgment against them.

Finally, Defendants' argument that the punitive damages award in this case must be vacated

because the jury may have awarded punitive damages against Defendants based on their treatment

of women other than Plaintiff is similarly without merit.  The court's decision in *Kauffman v.*

*Maxim Healthcare Serv.*, 509 F. Supp.2d 210 (E.D.N.Y. 2007) is particularly instructive on this

point.  In *Kauffman*, the defendants, as here, requested a new trial on the issue of punitive damages

because of the fact that the jury may have awarded the damages for conduct towards women other

than the plaintiff.  The court began by noting that the plaintiff presented ample evidence of

discriminatory conduct directed towards her to justify the punitive damages award.  *Id.* at 214.  As

set forth herein, Plaintiff has similarly presented substantial evidence of conduct directed towards

her personally.  More importantly, the court held that even had the jury made the award based on

conduct towards women other than the plaintiff, the defendants had waived their right to challenge

the award on that ground by virtue of their failure to object to the court's jury instruction on

punitive damages.  *Id.* at 215 (*citing Phillip Morris, USA v. Williams*, 127 S. Ct. 1057, 1065

(2007)).  Similarly, in the instant case, Defendants never objected to the Court's instructions for

punitive damages, nor did they request a specific instruction in line with *Phillip Morris*.  Trial Tr.

at 1439-44.  Accordingly, they have waived their right to challenge the award on this basis.

## IV.

## A NEW TRIAL ON DAMAGES SHOULD NOT ALSO REVISIT LIABILITY

Defendants further argue for a retrial on all issues in the event the Court concludes a new

trial is required respect to damages.  Contrary to Defendants' assertions, in this case the damages

and liability are not so interwoven as to require a full retrial.  In the first instance, Defendants have

---

[17]     For a complete discussion of Defendants' assets, Plaintiff respectfully refers the Court to Plaintiff's
memorandum of law in opposition to Defendants' motion to stay the execution of the judgment.

waived the right to challenge whether Plaintiff has met the requirements for punitive damages. Trial Tr. at 1439-44. Thus, the issues for punitive damages are entirely distinct from liability because actual malice or reckless indifference has been admitted through waiver and the only remaining issue is the amount of damages. As the trial process demonstrated, the determination of the punitive damage amount can be promptly accomplished with a separate, limited proceeding. In this manner, *Kim v. Dial Service Int'l Inc.*, No. 96 Civ. 3327 (DLC), 1997 WL 458783 (S.D.N.Y. Aug. 11, 1997), upon which Defendants rely, is distinguished. In *Kim*, the court emphasized the need for a new trial based upon the fact that the malice required for punitive damages was closely linked to evidence of liability.[18]

The Second Circuit has also made clear, however, that a trial on damages alone is appropriate where liability has been properly determined. *Diamond D Enterprises USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992); *see also Wheatley v. Beetar*, 637 F.2d 863, 867 (2d Cir. 1980) (granting new trial solely on damages despite necessary introduction of some of evidence from liability phase, noting unfairness and grave injustice to require a retrial of the issue of culpability already decided by the jury). Here, liability was firmly established. As the Court itself recognized, so long as the jury found Plaintiff and Plaintiff's witnesses to be credible, the evidence established her hostile work environment claim. Trial Tr. at 552. Given the deference to a jury's credibility determinations, revisiting liability would be a purely unnecessary, duplicative effort. The Defendants' request for a retrial on both liability and damages should therefore be denied.

---

[18]    In one sentence without further discussion or analysis, Judge Cote also stated "the compensatory damage award also requires the jury to understand the context for the mental anguish." *Id.* at *16. The Second Circuit, however, has remanded for a damages-only retrial, despite the fact the amount of emotional distress was to be reconsidered. *See, e.g., Annis v. County of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998). Thus, these damages can certainly be ascertained separate from liability.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Motion should be denied in its entirety.

Dated: New York, New York
      February 5, 2008

THOMPSON WIGDOR & GILLY LLP

By: _____
      Kenneth P. Thompson (KT-6026)
      Scott Browning Gilly (SG-6861)
      Kathryn J. Webber (KW-9576)

350 Fifth Avenue
Suite 5720
New York, New York 10118-0110
(212) 239-9292

Attorneys for Plaintiff